```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     Norfolk Division

3

4  - - - - - - - - - - - - - - - - - - -
                                   )
5    UNITED STATES OF AMERICA,     )
                                   )
6           Plaintiff              )   CRIMINAL ACTION NO.
                                   )   2:11cr36
7    v.                            )
                                   )
8    SAMUEL LLOYD,                 )
                                   )
9           Defendant.             )
   - - - - - - - - - - - - - - - - - - -
10

11

12                  TRANSCRIPT OF PROCEEDINGS

13                    (Detention hearing)

14                    Norfolk, Virginia

15                     April 22, 2011

16
   BEFORE:  THE HONORABLE DOUGLAS E. MILLER
17           United States Magistrate Judge

18

19  APPEARANCES:

20           UNITED STATES ATTORNEY'S OFFICE
            By:  Laura M. Everhart
21               Assistant United States Attorney
                 Counsel for the United States
22
            PAUL G. WATSON, IV
23          By:  Paul G. Watson, IV
                 Counsel for the Defendant
24

25
```

```
 1              (Hearing commenced at 2:12 p.m.)

 2              THE CLERK:  United States of America versus Samuel

 3    Lloyd, case number 2:11cr36.

 4              Are counsel ready to proceed?

 5              MS. EVERHART:  The United States is ready.  Good

 6    afternoon, Your Honor.

 7              THE COURT:  Good afternoon, Ms. Everhart.

 8              MR. WATSON:  Good afternoon.

 9              THE COURT:  Mr. Watson.

10              All right.  Have all counsel received a copy of --

11    what the Court has is a copy of an original bond report that

12    was prepared in Georgia, I believe, and an addendum that was

13    prepared here by Ms. Goodwin.  Both counsel have copies of

14    those two reports?

15              MS. EVERHART:  I do, Your Honor.

16              MR. WATSON:  Yes.

17              THE COURT:  All right.  Ms. Everhart, is the

18    Government still seeking detention?

19              MS. EVERHART:  Yes, sir.

20              THE COURT:  All right.  And, Mr. Watson, I assume --

21    well, how are we going forward?  Are we going forward with

22    the hearing?

23              MR. WATSON:  Yes.

24              THE COURT:  All right.  Ms. Everhart, you going to

25    proceed by way of proffer or how do you want to proceed?
```

1          MS. EVERHART:  By way of proffer, Your Honor.

2          THE COURT:  All right.  You all can have a seat.

3          MS. EVERHART:  Your Honor, this indictment is the

4    result of an extensive investigation that went on over a

5    period of nearly two years by ICE into the activities of

6    Mr. Lloyd, who is one of the principals in this conspiracy,

7    and a number of others that have been charged in this

8    indictment; three that were charged in an indictment earlier

9    this year, and I believe five that have been previously

10   brought before this Court and pleaded guilty and are

11   cooperating with the United States.

12         It has involved putting, I would say, close to 36

13   witnesses before the Grand Jury talking about the activities

14   of these individuals.  It involved, I would estimate, since I

15   had to submit them, about 25 or 30 pin registers and five

16   wiretaps on phones belonging to two of the other principals,

17   Clive Black and Trenton Hawkins.

18         The defendant is Jamaican, as are a number of other

19   people associated with this group, including Clive Black and

20   Robert Napier, who was arrested down in Atlanta as part of

21   this conspiracy with 21 kilos of cocaine.

22         The defendant's participation began --

23         THE COURT:  Let me make sure I understand what you

24   said.  Clive Black was arrested with 21 kilos?

25         MS. EVERHART:  No, Your Honor, Robert Napier was.

1         THE COURT:  Okay.  But not Samuel Lloyd, right?

2         MS. EVERHART:  No, not Samuel Lloyd.

3         THE COURT:  Okay.

4         MS. EVERHART:  But as far as this conspiracy -- and

5    that happened in January of this year.

6         THE COURT:  Okay.

7         MS. EVERHART:  The defendant's participation,

8    according to the witnesses, began prior to 2004, but in 2004

9    the defendant had relocated to Atlanta, and he was selling to

10   Clive Black and another unindicted co-conspirator, 10 kilos

11   of cocaine at a time.  This went on for a period of time

12   until the defendant had a dispute over money with the

13   unindicted co-conspirator.  However, he maintained his

14   relationship with Clive Black.

15        The girlfriend that's been proposed as a third-party

16   custodian has been his girlfriend throughout the whole course

17   of this conspiracy.  She was living in Atlanta with him while

18   these activities were taking place.  Many of the activities

19   took place at the location where he is now living with that

20   same girlfriend.

21        The defendant, according to the witnesses and

22   surveillance and the various phone calls that were monitored

23   over the course of this investigation, indicates that he had

24   a connection, as did Mr. Daughtrey, who is another one of the

25   lead co-defendants, have a connection in Mexico.

1          Mr. Daughtrey and another co-defendant, David

2     Wheeler, actually went down to Mexico, and we have the

3     documents from immigration, from ICE documenting their visits

4     down there in June of '08.

5          Soon thereafter a shipment of 1700 pounds of

6     marijuana was arranged.  That was brought back to this area

7     in a tractor-trailer load underneath a bunch of watermelons.

8     It was unloaded here and much of it was sold.  However, 212

9     pounds of the marijuana was seized from a storage unit out in

10    Virginia Beach in 2008, and that was in part what led to the

11    entire investigation.

12         There was another storage unit that had been used to

13    store marijuana by this group and that was cleaned out before

14    anyone could get over there and look.  We already have one --

15    we have three defendants who were out of state at the time of

16    the indictment, the defendant being one, and the others being

17    David Wheeler, excuse me, and Michael Daughtrey.

18         Mr. Daughtrey knows that we are looking for him.

19    They were trying to apprehend him in Massachusetts.  He

20    actually had an attorney call ICE, and he apparently has

21    fled.  So we already have one out-of-state fugitive in this

22    case, and he was very strongly connected to Mr. Lloyd.

23         Mr. Lloyd and Mr. Napier, according to surveillance,

24    and there was very, very extensive surveillance in this case,

25    Your Honor, volumes and volumes of it, are known to have come

1    down here in April of 2009 on a train.  They came into

2    Newport News.  They ended up at the -- the group had

3    maintained a stash house over on Berkley Drive in Virginia

4    Beach where all of these individuals were known to spend

5    time.  It was used for various drug related activities.

6          Occasionally somebody would actually stay there and

7    actually spend the night.  Mr. Lloyd and many of the other

8    co-conspirators had a key to this place.  They were --

9    Mr. Lloyd and Mr. Napier, according to Mr. Napier and others,

10   were here to arrange a marijuana deal involving a

11   tractor-trailer that was driven by Trent Hawkins with a

12   compartment in the floor.

13         And shortly thereafter that marijuana arrived in the

14   area, and on April 27th, 2009, one of Mr. Lloyd's couriers

15   was interdicted, I believe down in North Carolina, and she

16   was found to have 30 pounds of marijuana, and she was -- she

17   was apprehended at that point.

18         Little -- well, about two months later, Mr. Hawkins

19   was on his way to Texas with over $600,000 with the plan to

20   buy more marijuana and I think approximately 30 kilograms of

21   cocaine from this Mexican connection that Mr. Daughtrey and

22   Mr. Lloyd had.

23         Unfortunately for him, he was stopped in

24   Mississippi, another traffic stop, and they took his

25   $600,000.  Mr. Hawkins has since pleaded guilty in this

1    jurisdiction and is cooperating with the United States, which

2    he had done prior to his indictment in this court.

3            THE COURT:  So has Mr. Hawkins identified --

4    because, frankly, you're describing a lot of information that

5    goes far beyond what the indictment suggests Mr. Lloyds'

6    involvement was.  Does this come from Mr. Hawkins --

7            MS. EVERHART:  Your Honor, this comes from --

8            THE COURT:  -- or from Mr. Napier?

9            MS. EVERHART:  This comes from Mr. Hawkins,

10   Mr. Napier, from recorded telephone calls and surveillance

11   and from all of the other witnesses in the case of which, as

12   I say, there have been many connected with this

13   investigation, both local and otherwise.

14           On -- in some of the recorded phone calls, the

15   defendant is heard arranging deals, speaking with Mr. Black

16   about trying to set up sort of satellite locations in

17   Maryland and West Virginia.

18           In May of '09 he and Andre Todd, who pleaded guilty

19   yesterday, were involved trying to set up a ten pound --

20   excuse me, a thousand pound marijuana transaction, this is

21   caught on surveillance, and Mr. Black was present for that.

22   Mr. Black has been cooperating since shortly after that time

23   or right around that time.

24           On June 19th, 2009, Mr. Lloyd was in town and seen

25   by the investigative team.  He was here to collect a drug

1   debt, and by that time Mr. Black was cooperating.  Mr. Lloyd,

2   in connection with an attempt to collect this drug debt, gave

3   Mr. Black a gun.  Mr. Black, of course, immediately turned it

4   over to the authorities here, and that is in evidence, and

5   that came from Mr. Lloyd.

6           In connection with this and associates of Mr. Lloyd,

7   there have been other seizures.  One of them was on November

8   the 13th, 2008, which followed closely upon the heels of

9   Mr. Daughtrey and Mr. Lloyd making various flights between

10  Atlanta and Washington, D.C., and other areas, and that

11  courier was apprehended with $264,000 in a vehicle that she

12  was driving with a secret compartment.

13          The group employed a number of vehicles, primarily

14  F-150 pickup trucks with secret compartments that were used

15  to both transport drugs and money, and several of them have

16  been taken off in interdictions and stuff and folks in this

17  jurisdiction and also elsewhere.

18          For all these reasons, Your Honor, we would submit

19  that the evidence in this case is very strong, that Mr. Lloyd

20  was a principal in a very, very extensive conspiracy

21  involving a lot of money and an awful lot of drugs over a

22  long period of time.

23          Although it is true that Mr. Lloyd has sort of been

24  the Teflon drug dealer in all of this, unfortunately for

25  Mr. Lloyd, many of those around him have fallen in the last

1    couple of years, and they are all -- they have all pleaded

2    guilty and admitted their part and have implicated Mr. Lloyd

3    and are prepared to testify.

4            As for his employment, I do not know anything about

5    this social club.  However, I do know from several of the

6    witnesses that Doug Dollar Distribution was, at least in the

7    opinion of these witnesses, a cover business for Mr. Lloyd's

8    true business which was drugs.  And I would, of course, also

9    say that that employment, so far as I know, has never been

10   verified, whether he even had a business license or anything

11   of that nature.

12           THE COURT:  You talking about L&S or Doug Dar?

13           MS. EVERHART:  So far as I know, looking at this

14   report, I don't think either of them have been verified.

15   They are self-employment.  So it might be difficult to do so.

16           THE COURT:  All right.  The -- I presume even though

17   it's only two counts that these carry a maximum punishment in

18   excess of ten years?

19           MS. EVERHART:  Yes, Your Honor, maximum of life, ten

20   year mandatory minimum.

21           THE COURT:  All right.

22           All right.  Anything else?

23           MS. EVERHART:  No, Your Honor.

24           THE COURT:  All right.  Thanks, Ms. Everhart.

25           Mr. Watson, did you want to call a witness, proceed

1    by proffer?

2            MR. WATSON:  Proceed by proffer.

3            THE COURT:  All right.

4            MR. WATSON:  What we would proffer to the Court, as

5    per the pretrial services report, that Mr. Lloyd has been in

6    this country for, I believe, over 12 years.  He is a

7    naturalized citizen, has absolutely no criminal record

8    whatsoever, 48 years old.  Probably wouldn't have a criminal

9    record here if he did anything in Jamaica, but we do know

10   that he has not committed any offenses in the United States

11   and been here over 12 years.

12           As, again, the pretrial services report states, he

13   owns his own business in Atlanta.  His fiancee, girlfriend,

14   has her own business.  They have one child together, and she

15   has another child that has been residing with him for the

16   entire time they've been together.

17           I would ask the Court to consider granting Mr. Lloyd

18   a bond.  I certainly understand the drug presumption applies

19   here, and the presumption is no conditional ensure -- or can

20   ensure his appearance or safety to the community, but would

21   assert here, with his lack of criminal record, ties to the

22   community, that is, the Atlanta community, would ask the

23   Court to consider granting him a bond and putting him on home

24   detention at a house where he's been residing in Atlanta, I

25   guess more particularly Stone Mountain, Georgia.

1          It appears as if a -- maybe a few more small steps

2    would have to be accomplished for that house to have the home

3    monitoring set up, but it certainly is available to be set up

4    there.

5          Certainly understand the Government's proffer, but

6    did hear a lot of what other people did, what other people

7    were caught with.  Mr. Lloyd certainly doesn't appear as if

8    he was caught with anything, and quite a number, it sounds

9    like, literally, dozens of people involved in this case,

10   maybe even that many as defendants eventually.

11         So it certainly sounds like there are a number of

12   different roles that all these different people played and

13   would submit to the Court that Mr. Lloyd -- there is no

14   evidence, direct evidence of him ever being caught with the

15   drugs or the money or anything of that nature.

16         So I would ask the Court to consider those facts,

17   proffered facts, and as overcoming the presumption and allow

18   him to -- or grant him a bond.

19         THE COURT:  All right.  Ms. Everhart, I think you

20   proffered that there was some evidence that the defendant

21   traveled to Mexico in June of '08?

22         MS. EVERHART:  No, Your Honor.  He was part of the

23   group that was organizing or, you know, attempting to

24   organize at that point a big trip down to -- to get with

25   their Mexican connections and bring back a large quantity of

1    marijuana and also cocaine.  It was not he who actually went

2    to Mexico.  It was Mr. Wheeler and Mr. Daughtrey, two of the

3    co-defendants.  And I would like to say in response to

4    something that was said that one of the reasons he's only

5    charged in two counts in the indictment is there were a lot

6    of the things that the defendant did in furtherance of this

7    conspiracy occurred outside of the Eastern District of

8    Virginia and we have no venue.

9         THE COURT:  All right.  Mr. Watson, the

10   recommendation of the Georgia pretrial office was that he

11   post a secured bond in the amount of $25,000.  Have you

12   discussed with your client his ability to post a secured

13   bond?

14        MR. WATSON:  I have.  I've also spoken to his

15   fiancee twice and spoke to her about that.  I know it would

16   be difficult for them to do, but certainly possible, but also

17   advised him of an unsecured bond was what --

18        THE COURT:  Well, I mean, the problem is he is not

19   local.  I mean, frankly, if he were local, this would be an

20   easier decision, but he's not local, and that's -- in

21   combination with everything that Ms. Everhart just proffered,

22   it's difficult to fashion conditions that would ensure his

23   appearance given that he has really no connection to Hampton

24   Roads, and he's facing the possibility of life in prison.

25        I'm not as concerned with danger, although I

1   recognize it's an involved conspiracy, but there doesn't

2   appear to be any history of violence.  He has absolutely no

3   criminal record.  But I am concerned about the risk of flight

4   given how extensive this network is and or is alleged to

5   be -- well, is in some cases, some of these folks have

6   already admitted their involvement.

7          MR. WATSON:  I'd hope he would have had a cousin or

8   something or relative or friend in Hampton Roads area, but

9   there is no one in the Eastern District, within the Eastern

10  District.  It's -- well, how he's lived in Stone Mountain

11  right outside of Atlanta is the only place that that's the

12  possibility.

13         THE COURT:  And, Mr. Grant, do you know if anyone's

14  communicated?  I'm assuming if he gets bond he'd have to be

15  supervised down there?  Have you talked to or has Ms. Goodwin

16  talked to anybody about supervision done there?

17         MR. GRANT:  No, Your Honor.  We usually do that

18  after they are released on bond so that we can coordinate

19  with them about the Court instructions and so forth.

20         THE COURT:  All right.  Well, this is what I'm going

21  to do.  I recognize it is a serious charge, Ms. Everhart, and

22  I recognize he's facing a lot of time, but I believe that --

23  I don't believe that he poses a danger to the community based

24  on he has zero criminal record.  I mean, unless this

25  information is wrong, the information that the probation

1    office -- I mean, he is 48 years old, and he's been in this

2    country at least 12 years, maybe 13, and he has absolutely no

3    criminal record, I mean, not even a reckless driving.

4           And that although he's accused of a fairly elaborate

5    drug conspiracy, it also appears he is accused with a number

6    of other people who have already acknowledged their

7    responsibility for a fairly elaborate conspiracy.  And other

8    than this one -- there is apparently some evidence that he

9    delivered a gun, but that's not charged in the indictment,

10   and in any event, I don't find that there's evidence that he

11   needs -- that he poses a real threat to the community, but I

12   do -- I am concerned about risk of flight.

13          So as a condition of his release, he's going to be

14   required to abide by all of the conditions that are spelled

15   out in the pretrial services report issued out of the -- I

16   guess this is the Northern District of Georgia, Northern

17   District of Georgia in Atlanta, including he's going to be

18   required to post a $25,000 secured bond.

19          He's to submit to supervision by the pretrial

20   services office in the Northern District of Georgia, if we

21   can coordinate their agreement to accept supervision.

22          MR. GRANT:  Yes, Your Honor.

23          THE COURT:  He is to refrain -- go ahead.

24          MS. EVERHART:  Your Honor, I just wanted to say that

25   the gun is in the indictment as overt act 50 in the

1    conspiracy count.

2              THE COURT:  Oh, his specific?

3              MS. EVERHART:  Yes.

4              THE COURT:  All right.  Well, I see that is

5    referenced as an overt act in the conspiracy but he was not

6    charged separately with the 924(c) or use or possession, use

7    in relation to a drug trafficking crime.

8              So, in any event, I appreciate your bringing that to

9    my attention but I still believe that he is a candidate for

10   bond subject to these conditions.

11             I think these conditions would be sufficient to

12   ensure the safety of the community and ensure that he would

13   appear for trial.  But he is going to have to post a secured

14   bond.  He is going to have to refrain from the use or

15   unlawful possession of narcotic drug or other controlled

16   substances unless prescribed by a medical practitioner.

17             Does he have to take narcotics for his hip or back

18   pain?

19             MR. WATSON:  I'm not sure.  It sounds like it is a

20   prescription strength ibuprofen.

21             THE COURT:  All right.  Well, whatever it is, he

22   will have to furnish a copy of the prescription once he's

23   released to the folks who are handling his supervision.  He's

24   to refrain from the excessive use of alcohol, submit to

25   substance abuse testing and treatment as recommended by the

1    probation office there.

2          His travel is restricted to the Northern District of

3    Georgia and the Eastern District of Virginia as necessary for

4    court appearances.  He is to surrender any U.S. passport that

5    he has.  Does he have a passport, Mr. Watson?

6          MR. WATSON:  Yes.

7          THE COURT:  He is to surrender that before he is

8    released and not to apply for any new passport or travel

9    documents.  He is to maintain or actively seek lawful

10   verifiable employment.  That means you are going to have to

11   produce some record that he's working for this sports club,

12   whatever it is.

13         He's not to possess any firearms, dangerous weapons

14   or destructive devices, and he is going to have to maintain

15   his permanent residence at 4749 Manley Court, Stone Mountain,

16   Georgia with his fiancee, Celina Collins.  And he is to

17   submit to electronic monitoring at that address with

18   time-outs as directed by the probation office handling his

19   supervision.

20         Now, it will take some time to put all that in

21   place, the secured bond and the electronic monitoring, and so

22   he's going to be remanded for today and that will give Ms.

23   Everhart a chance to evaluate whether she wants to appeal my

24   decision.  But I understand it is a serious charge, Ms.

25   Everhart, but he has basically no criminal record -- well,

1    not basically, he has no criminal record.

2            MS. EVERHART:  Although pretrial has pointed out

3    that actually he was put in diversion and then it was

4    dismissed.  So apparently they found sufficient evidence to

5    convict but they gave him a diversionary sentence.

6            THE COURT:  That just indicates he's a candidate for

7    supervision.  He is able to comply when he's -- but I

8    understand.  It is a serious charge, and I don't mean to -- I

9    know there was -- is a presumption, but he appears to have a

10   relatively stable living arrangement and has managed to avoid

11   any kind of criminal record, and there doesn't appear to be,

12   other than the one gun reference, there doesn't appear to be

13   any issue of violence.

14           And as I said, while he -- the evidence is strong

15   that he has a role, a number of other people also have a

16   role, and they've all admitted their conduct and that -- so

17   it's not completely clear that -- in any event, the evidence

18   alone is not sufficient to deny him bond.

19           MS. EVERHART:  Your Honor, two things.  First, the

20   electronic monitoring, would that be realtime GPS, which I

21   think in a case like this would be advisable?

22           THE COURT:  Yes, that would be realtime GPS,

23   assuming they can do it down there.  Can they?

24           MR. GRANT:  And that's what I was going to bring it

25   up, Your Honor, is that a problem if they do not have the

```
1    capability in Georgia?
2            THE COURT:  Well, what capability would they have
3    other than that?  They would just have the ability to say --
4            MR. GRANT:  Just the standard radio frequency --
5            THE COURT:  Which is?
6            MR. GRANT:  -- that he came in or out on the proper
7    time.  It wouldn't give us any kind of a location monitoring.
8            THE COURT:  No, it needs to be the kind we can do
9    here with realtime GPS monitoring.  So he needs to be able to
10   be monitored so that if he is not where he is supposed to be,
11   we know where he is.  You understand that, Mr. Watson?
12           MR. WATSON:  I do.
13           MR. GRANT:  Your Honor, would you like me to inquire
14   of Georgia as soon as this hearing is over and try and get
15   back to you before the end of the day?
16           THE COURT:  Yeah, let's do that, see if they can do
17   that.  I presume they can.  I mean, it is a big city.  It's
18   not --
19           MR. GRANT:  I understand, but I have had problems
20   with Ohio with this very incident, so I -- you know, I would
21   rather be on the safe side.
22           THE COURT:  All right.  Well, I don't know that we
23   have to have an answer.  He is not going to get -- he is
24   going to be held over the weekend because he is going to have
25   to have some kind of electronic monitoring and the bond
```

```
 1   posted.  So that's going to be the ruling of the Court, that
 2   he is going to have to be subject to realtime GPS monitoring.
 3   So if he is not able to be subject because of some
 4   shortcoming there, then we will have to reconvene.
 5          But so you can -- you don't need to follow up with
 6   me today.  You can follow up with me once you get the answer.
 7          MR. GRANT:  Yes, sir.
 8          MS. EVERHART:  And what was the dollar amount of the
 9   bond?  I'm sorry, Your Honor.
10          THE COURT:  $25,000 secured.
11          All right.  Do we need to -- can we arraign him
12   today?  Are we ready to arraign?
13          MS. EVERHART:  No, Your Honor.  He will be arraigned
14   with the co-defendants on Wednesday.
15          THE COURT:  Okay.  So he'll be in custody at least
16   until Wednesday --
17          MS. EVERHART:  Yes.
18          THE COURT:  -- because he's going to stay here for
19   arraignment.
20          All right.
21          MS. EVERHART:  9 o'clock.
22          THE COURT:  So we will set arraignment for 9 a.m.
23   Wednesday, and actually -- well, if -- depending on what you
24   find out, Mr. Grant, if you find out that they -- if you find
25   out they can do it, then it's no problem.  That's the Court's
```

1    release order, and everybody knows what their remedies or

2    rights are after that.

3           It will be up to them to post and arrange their

4    electronic monitoring, and then once all that's put in place,

5    he can be released to go down there.  But I presume that will

6    all take place no sooner than Wednesday because he needs to

7    stay here for arraignment.  If it turns out they can't do it,

8    let me know and I'll ask Ms. Forehand or Ms. Dodge or

9    somebody to contact counsel and put it back on for a

10   reconvening of this hearing.

11          MR. GRANT:  Yes, Your Honor.

12          THE COURT:  All right.

13          MS. EVERHART:  Yes, Your Honor.

14          THE COURT:  Understand that, Mr. Watson?

15          MR. WATSON:  Yes, sir.

16          THE COURT:  All right.  You can explain to your

17   client what's going on and what will happen next.

18          MR. WATSON:  Okay.

19          THE COURT:  All right.  Anything else we need to do

20   today in the matter?

21          MS. EVERHART:  No, Your Honor.

22          THE COURT:  I do have an order that you all

23   apparently submitted at the last hearing which appears to

24   have been fully endorsed, a discovery order.  Want me to go

25   ahead and enter that?

```
1              MS. EVERHART:  Yes, Your Honor, please.
2              THE COURT:  I will enter that now.
3              Ms. Forehand, you want to take that?  Is that
4      everything we have?
5              All right.  Court will be in recess.
6              (Hearing adjourned at 2:40 p.m.)
7                          CERTIFICATION
8
9              I certify that the foregoing is a correct
10     transcript, to the best of my ability, of the court's audio
11     recording of proceedings in the above-entitled matter.
12
13             X_____/s/_____x
14                        Jody A. Stewart
15                   X_____4-27-2011_____x
16                            Date
17
18
19
20
21
22
23
24
25
```

JODY A. STEWART, Official Court Reporter