SENTENCING HEARING
TRANSCRIPTS

```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     NORFOLK DIVISION

3

4  UNITED STATES OF AMERICA,    )
                                )
5            Plaintiff,         )
                                )
6  v.                           )    Criminal Action No.:
                                )       2:11cr36
7  SAMUEL LLOYD,                )
                                )
8            Defendant.         )

9

10                 TRANSCRIPT OF PROCEEDINGS

11                      (Sentencing)

12

                        Norfolk, Virginia
13                      January 30, 2012

14

15

16  BEFORE:      THE HONORABLE MARK S. DAVIS
                 United States District Judge
17

18

19  Appearances:

20       OFFICE OF THE UNITED STATES ATTORNEY
                 By: LAURA M. EVERHART, ESQUIRE
21                   Counsel for the United States

22       PAUL G WATSON IV PC
                 By: PAUL GRANVILLE WATSON, IV, ESQUIRE
23                   Counsel for Defendant

24       The Defendant appearing in person.

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter



1                    P R O C E E D I N G S

2

3          (Proceedings commenced at 10:34 a.m. as follows:)

4

5          COURTROOM DEPUTY:  In Case No. 2:11cr36, United States

6   of America v. Samuel Lloyd.  Ms. Everhart, is the government

7   ready to proceed?

8          MS. EVERHART:  The United States is ready, Your Honor.

9   Good morning.

10         THE COURT:  Good morning.

11         COURTROOM DEPUTY:  Mr. Watson, is the defendant ready

12  to proceed?

13         MR. WATSON:  We are ready.  Good morning.

14         THE COURT:  Good morning.

15         All right.  Mr. Watson, is Mr. Lloyd going to remain

16  in the wheelchair?  How are you planning to conduct the

17  proceedings at the podium?  Were you -- had you given thought to

18  that?

19         MR. WATSON:  I had not.

20         THE COURT:  Okay.  I don't know the extent to which he

21  uses that all the time or if he doesn't need it to stand.  I

22  don't know.  So maybe you need to talk to him about that issue.

23         MR. WATSON:  He's not able to stand for any

24  appreciable amount of time.

25         THE COURT:  All right.  Then what we'll do, because of

1  that, and because I want you near him, is I'm going to let you

2  just stay there at counsel table. But you need to make sure

3  you're speaking up or speaking into the mic.

4       MR. WATSON: Yes, sir. Do I need to move this screen

5  at all for the court to see Mr. Lloyd?

6       THE COURT: No. I can see him just fine. So let's

7  administer the oath to Mr. Lloyd.

8       (Defendant was placed under oath.)

9       THE COURT: On September 4th, 2011, Mr. Lloyd was

10  found guilty by a jury of four counts of a superseding

11  indictment: Count 1, conspiracy to distribute and possess with

12  intent to distribute five kilograms or more of cocaine and

13  1,000 kilograms or more of marihuana in violation of Title 21 of

14  the United States Code § 846, 841(a)(1) and (b)(1)(A); Count 5,

15  possession with intent to distribute more than 100 kilograms of

16  marihuana, in violation of Title 21 of the United States Code §

17  841(a)(1) and (b)(1)(B); Count 6, aiding and abetting the

18  possession with intent to distribute more than 100 kilograms of

19  marihuana in violation of Title 21 of the United States Code §

20  841(a)(1) and (b)(1)(B); and Count 26, aiding and abetting the

21  possession with intent to distribute marihuana in violation of

22  Title 21 of the United States Code § 841(a)(1) and (b)(1)(D).

23       The court accepted the verdict of guilt by the jury

24  and the matter was continued for sentencing. The court has now

25  reviewed the presentence report that was prepared on

```
 1  December 2nd, 2011, along with the addendum that was prepared on

 2  January 20 of 2012.

 3          Mr. Watson, have you reviewed the presentence report

 4  with the addendum and had enough time to review it with

 5  Mr. Lloyd?

 6          MR. WATSON:  Yes, sir.

 7          THE COURT:  And other than the objections that you've

 8  filed, are there any errors contained in the report?

 9          MR. WATSON:  No, sir, there are no other errors.

10          THE COURT:  Mr. Lloyd, have you reviewed the

11  presentence report and the addendum?

12          THE DEFENDANT:  Yes, sir, Your Honor.

13          THE COURT:  Did you have enough time to review it with

14  Mr. Watson?

15          THE DEFENDANT:  Yes, sir, Your Honor.

16          THE COURT:  Other than the objections that Mr. Watson

17  has filed already, did you find any errors in the presentence

18  report?

19          Do you understand my question?  Mr. Watson has already

20  filed a paper in which he lists all the objections that he found

21  after reviewing the presentence report.  And I would, I assume

22  that he did that also after talking with you after you had

23  reviewed the presentence report.  So he's filed a list of those

24  objections.  My question to you is did you find any other

25  errors, anything else in that presentence report that you need
```

1  to call to our attention at this time other than what Mr. Watson

2  has already listed?

3          THE DEFENDANT:  No, Your Honor.

4          THE COURT:  Okay.  Do you -- while, of course, no

5  presentence report can provide a complete biography of anybody's

6  life, do you think that the presentence report fully covers your

7  background?

8          THE DEFENDANT:  That is correct.

9          THE COURT:  Okay.  Well, let's take up these issues as

10 best we can one at a time.  There are some overlap, I know, in

11 these issues, but we have numerous drug weight objections.  And

12 so let's look at the defendant's drug weight objections first.

13          All right.  Now, it seems that the Paragraph 20 drug

14 weight objection would be the first one to address from

15 defendant's paper, and that is an objection to the defendant

16 being attributed with 20 kilograms of cocaine.  And this of

17 course overlaps with the government's objection.  The government

18 asserts that Paragraph 20 should attribute the defendant with

19 30 kilograms of cocaine, not 20, on this testimony.  So Mr.

20 Watson, I don't know that you need now to be at the table with

21 your client unless you think, unless you think you do.  You can

22 come on up to the podium and we can start going through these.

23          MR. WATSON:  Yes, sir.

24          THE COURT:  So on this first one, we're looking at the

25 transcript Pages 265 and 433 through 34; is that right?

1           MR. WATSON:  Yes, sir.

2           THE COURT:  Okay.  Now, why don't you go ahead and

3  make your argument?

4           MR. WATSON:  Yes.  Of course both Clive Black and

5  Mario Woods testified as to these trips to Atlanta.  They both

6  testified a little -- well, they each testified a little

7  differently as to how many trips and exactly how much cocaine

8  was purchased.  Mario Woods testified he purchased it from

9  someone named Jay who was with Mr. Lloyd; that at least on the

10  second trip that he met Mr. Lloyd before he met with Jay.  And I

11  would submit to the court that the 20 kilograms of cocaine

12  that's been attributed to Mr. Lloyd is improper because the --

13  it is certainly not less than what either one of them testified

14  to, but there was inconsistent testimony as to exactly what

15  happened, and with these events taking place several years ago,

16  that the inconsistent testimony is not reliable enough to

17  attribute 20 kilograms of cocaine to Mr. Lloyd.

18           THE COURT:  Okay.  Do you have the transcript with

19  you?

20           MR. WATSON:  Yes, sir, I do.

21           THE COURT:  Okay.  Why don't we go through and look at

22  these references so that we can be specific about this.

23           Page 265 was your first?

24           MR. WATSON:  Yes, sir.  Mr. Black testified that he --

25  well, that there was one trip, and then he goes on to say there

1   were two other trips he went with Mario.

2          THE COURT:  Okay.  He says, "Yes, ma'am.  We went back

3   for two other trips.  I went with Mario and two more trips.

4          "After that did they go in more or less the same way

5   that the first one had?"

6          And he says, Mr. Black says "Yes, ma'am."

7          And then on Page 433 -- is that all on 265 with

8   respect to that issue from your standpoint?

9          MR. WATSON:  Yes, sir, I believe so.  I think the only

10  other item of note is that Mr. Black testified that it was

11  three kilos the first time on Line 5 of Page 265.

12          THE COURT:  Three kilos.  Okay.  And she asked, "You

13  would need 60 or 70,000 for that much."  So okay.

14          Then on Page 433 -- and this is Woods testifying?

15          MR. WATSON:  Yes, sir.  I believe it's accurate to say

16  Mr. Woods testified he received 10 kilos on the first trip, and

17  I believe he testified that he only had one additional trip and

18  he got 20 kilos the second trip.

19          THE COURT:  So Page 433, Line 20, "How much cocaine

20  did you get on that trip?

21          "Ten kilos."?

22          MR. WATSON:  Yes, sir.

23          THE COURT:  "And how much did you owe for that?"

24          "Like $120,000."

25       .  It seems to be less per kilo than the kilogram

1  reference by Black back on Page 265.

2            MR. WATSON:  Yes, sir, I would agree.

3            THE COURT:  "But they accepted the 70."

4            Then on 434, "Had you already been able" -- well, "Did

5  you make another trip to see Mr. Lloyd and his associate?

6            "Yes.

7            "And how long after the first one would you say that

8  it was?"

9            "A couple of days.

10            "Had you been able to sell that 10 kilograms of

11  cocaine already?" he's asked.

12            "Yes."

13            And then Ms. Everhart asked, "Tell us what happened on

14  that trip.

15            "Answer:  Went back, gave him the rest of the money

16  and then he gave us 20 kilos of cocaine."

17            All right.  So we have what would appear to be Woods'

18  testimony about 30 kilos total there, and you're arguing an

19  inconsistency between the Black testimony and the Woods

20  testimony.  Is that what the issue is?

21            MR. WATSON:  Yes, sir.

22            THE COURT:  Okay.  Anything else you want to tell me

23  about that before I hear from Ms. Everhart?

24            MR. WATSON:  Only one other item, and that is, it's

25  not entirely clear Mr. Lloyd's role in this.  It's very clear

1  Mr. Woods actually received the drugs from Jay as opposed to

2  Mr. Lloyd. Certainly from the testimony it appears that

3  Mr. Lloyd was nearby, but not entirely clear what he was doing

4  while Jay was completing the transaction with Mr. Woods.

5         THE COURT: Okay. On Page 433 Ms. Everhart asks a

6  question: "Okay. After you met Mr. Lloyd, what happened?

7         "Answer: There was another guy there with him, a guy

8  named Jay, you know. Mr. Lloyd didn't really, he didn't really

9  do no talk, he was just there. We didn't actually get it from

10  Mr. Lloyd. The other guy gave us the drugs.

11         "Question: Were they together?

12         "Answer: Yes."

13         And then on Page 434, this is when they went back the

14  second trip, "Did you drive in separate cars again?

15         "Answer: Yes.

16         "Did you make another trip to see Mr. Lloyd and his

17  associate?

18         "Answer: Yes."

19         Okay. Let me -- unless you have anything else on

20  this, let me hear from Ms. Everhart.

21         MR. WATSON: Nothing else.

22         MS. EVERHART: Your Honor, I will concede that the

23  testimony of Mr. Woods and the testimony of Mr. Black are not

24  precisely the same. Mr. Black, as is his wont, was very vague

25  in his testimony about these trips, whereas Mr. Woods was very

1 specific. And I think that the $120,000 is more or less the

2 down payment, and they were receiving the rest of the cocaine on

3 a front which is why he later makes reference to "the rest of

4 the money," which would be the rest of the payment for the

5 initial 10 kilos of cocaine.

6         And if you recall, Your Honor, on the last trip that

7 these two gentlemen, Mr. Woods and Mr. Black, took to see

8 Mr. Lloyd down in Atlanta, Mr. Woods didn't repay all of the

9 money, which led Mr. Lloyd and his associates to come up to this

10 area looking for Mr. Woods with guns ablazing and asking

11 Mr. Black where they were and Mr. Black then had to -- or

12 advised them that Woods had moved because there was a for sale

13 sign on the front yard to try to avoid any catastrophes.

14         So it's our position that it's the specific testimony

15 of Mr. Woods that ought to be used rather than the vague

16 testimony of Mr. Black, and he did not testify, nor was he

17 asked, specifically on these trips how much cocaine was involved

18 except for his version of what happened on the first trip.

19         THE COURT: What do you say about the difference in

20 the value that they were discussing? Does that raise any red

21 flags?

22         MS. EVERHART: Well, Your Honor, as I said, they were

23 paying part of the money directly when they received the

24 cocaine, they were paying the rest later on. So they weren't

25 paying for this cocaine outright.

1        THE COURT:  Well, let's look at that.  Where is that?

2  Do you have your transcripts with you?

3        MS. EVERHART:  No, I did not bring them down, Your

4  Honor, but you quoted from the transcript --

5        THE COURT:  We're going to be looking at a lot of

6  transcripts today, and you don't have them with you?

7        MS. EVERHART:  No, sir, I didn't bring them with me.

8        THE COURT:  Where are they?

9        MS. EVERHART:  They're down at my office.

10        THE COURT:  Down the street?

11        MS. EVERHART:  Yes.

12        THE COURT:  All right.  Page 433, "How much cocaine

13  did you get on that trip?

14            "Answer:  Ten kilos.

15            "Question:  How much did you owe for that?

16            "Like 120,000.

17            "Question:  But they accepted the 70?

18            "Yes.

19            "And to pay the rest later?

20            "Yes."

21        So it would appear that the total amount from that

22  exchange would be $120,000 for 10 kilos.

23        MS. EVERHART:  And see my interpretation of it, Your

24  Honor, is that they put the $70,000 down and that they were

25  still to owe 120,000 on it.  I agree that would be a low price

Paul L. McManus, RMR, FCRR Official Court Reporter

1  for 10 kilograms of cocaine if it was only $120,000, although

2  they were getting it wholesale down there.

3          THE COURT:  And you're asking for an increase to

4  30 kilograms based upon this testimony?

5          MS. EVERHART:  Yes, sir.

6          THE COURT:  All right.  Anything else you want to tell

7  me about that?

8          MS. EVERHART:  No, Your Honor, except that it was

9  Mr. Lloyd with whom Mr. Black made these arrangements.  This

10  person Jay may have been there and actually had possession of

11  the cocaine at the time, but the arrangements were made with

12  Mr. Lloyd, and he was present, so it obviously was reasonably

13  foreseeable to him.

14          THE COURT:  Okay.  On this issue I don't have any

15  problem with the question of whether or not Mr. Lloyd should be

16  attributed with cocaine.  It's a question of how much.  And in

17  making these decisions, of course, the court bears in mind that

18  the government has the burden of proving by a preponderance of

19  the evidence the quantity of drugs for which a defendant should

20  be held accountable.  And once the government has provided

21  evidence sufficient to justify inclusion of facts in the

22  presentence report, then the defendant has an affirmative duty

23  to make a showing that the information in the presentence report

24  is unreliable and articulate the reasons why the facts contained

25  there are untrue or inaccurate.

1          And so the argument is made that there's an

2    inconsistency here between Mr. Black's testimony and Mr. Woods'.

3    Mr. Black certainly was somewhat of a generalist at trial, and,

4    but he does say at Page 265, three kilograms the first time that

5    they went down, in contrast to the testimony of Mr. Woods.  And

6    so that's one issue.

7          And as we've discussed, we have the issue of the

8    value.  I can see how that could be construed the way that you

9    have suggested, Ms. Everhart, but it seems to me that the

10   question of what the value was for it has to be viewed in the

11   context of the clarity of the testimony by Mr. Woods.

12         It also has to be considered that Mr. Black testified

13   at Page 265, Line 8, "Question:  Could you tell us, after you

14   received this cocaine, what happened?"  This is the first trip

15   where he says in response to a question about how much he got.

16   "I think three keys the first time.  Three kilos."

17         And then later he says "Mario brought it back to

18   Virginia and sold it."

19         And he was asked what he did.  "I just drove behind

20   him -- or in front of him on the way.

21         "Did you sell any of this cocaine yourself?

22         "Answer:  No, not that I recall."

23         It seems that Mario is the person with the better

24   recollection of the amounts here, and he is specific as to the

25   amounts.  Mr. Black says, I think, he's not the one that sold

1  it, he was just driving behind or in front.

2          And so I think the testimony is most clear with

3  respect to Mr. Woods' drug weights, and I will, I do find by a

4  preponderance of the evidence that that weight is 30 kilograms.

5  So the defendant's objection is overruled, the government's

6  objection is sustained, and on this issue it will be amended to

7  reflect 30 kilograms.

8          All right.  Now, we have Paragraph 21 of the

9  presentence report.  Defendant is objecting to a factual

10  statement.  As I understand it this doesn't have any impact on

11  the guideline range.  It reports that in early 2005 a problem

12  occurred between UC-10.  No reason not to identify that person,

13  is there, Ms. Everhart?

14          MS. EVERHART:  Your Honor, that's Mr. Woods.

15          THE COURT:  Right.  I just, I want to be careful here.

16  I know -- I have the list of who they all are, but tell me if

17  there's any issue on any of them as we go through it.

18          MS. EVERHART:  Well, I think, Your Honor, any time

19  there's a reference to trial testimony, of course they have

20  publicly testified and there's really no reason to be concerned.

21          THE COURT:  But I don't think in the presentence

22  report it necessarily distinguishes clearly between what is

23  trial testimony and what's coming out of a government, you know,

24  debriefing that the agent here has --

25          MS. EVERHART:  Yes, sir.

1    THE COURT:  -- conducted.

2    MS. EVERHART:  Yes, sir.

3    THE COURT:  So in early 2005 a problem occurred

4 between UC-10 and Lloyd.  That's Mr. Woods.  Woods tried to

5 withhold money that he owed to Lloyd.  Black stated that Lloyd

6 and an unknown Jamaican male came to Black's house in

7 Chesapeake, Virginia looking for Mr. Woods.  And we discussed

8 that earlier.

9    Mr. Watson, your point on this?  Or your argument on

10 this?

11    MR. WATSON:  First, I certainly understand the court's

12 comment that this doesn't have any affect on the guidelines

13 range, but just wanted to point out when I saw guns or weapons

14 in the paragraph I certainly was concerned about this being a

15 alternative basis for a two-point enhancement and certainly

16 wanted to object out of an abundance of caution.

17    THE COURT:  Okay.  Well, I'll tell you what:  Do we

18 need it, Ms. Everhart?  Do I need to rule on this?

19    MS. EVERHART:  Your Honor, this is one of the

20 incidents that I'm relying on for a later -- well, to respond to

21 the defendant's objection regarding the firearm enhancement.

22 They're all sort of connected.  It's certainly not necessary.

23 This paragraph is not necessary for the calculation of the

24 guidelines, but there was testimony as to it and it is relevant

25 insofar as the firearm enhancement.

1          THE COURT:  All right.  Well, let's -- okay.  So this

2  is Page 265 and Page 266?

3          MS. EVERHART:  Yes, Your Honor.

4          MR. WATSON:  And just to be clear, of course there are

5  two mentions of the firearm in the presentence report, the one

6  in this paragraph and then one in Paragraphs 39 and 40.  And I

7  just wanted to be clear that those are the --

8          THE COURT:  This is Paragraph 21.

9          MR. WATSON:  Yes, sir.

10          THE COURT:  And there's no mention of a firearm there,

11  is there?

12          MS. EVERHART:  No, there is not.

13          THE COURT:  No.  Okay.  So it says -- this is, again,

14  Mr. Black's testimony after they came back.  Ms. Everhart asked

15  "The last trip that you took with Mario, was there a problem?

16          "Answer:  Yes.  He wouldn't pay for the cocaine once

17  he got back.

18          "Question:  Who was this?

19          Answer:  Mario.

20          "Question:  And why wouldn't he pay for it?

21          "Answer:  I guess he wanted to keep the money.

22          "Question:  And what happened as a result of that?

23          "Answer:  It was a friction, you know.  They, it was

24  a, started like almost a war over the money.

25          "Question:  Tell us what you mean by that.

1          "Answer: Well, there was another party that involved

2   in this whole scenario back in Atlanta named Blacks, and they

3   came back to my house looking for Mario with guns and stuff

4   trying to find out where he lived because they wanted the money.

5   They wanted me to take him to his house, but he had a for-sale

6   sign on the house, so I just take them to a house and say that

7   was it, and they didn't find him to get their money.

8          "Question: Why didn't you want Mr. Lloyd and his

9   friends to find Mario Woods?

10          "Answer. Well, I thought they would kill him, and he

11  had two daughters. So that's why."

12          Well, there was other testimony on this issue also,

13  wasn't there, Mr. Watson?

14          MR. WATSON: I don't believe there was other testimony

15  on this incident. There was other testimony on another incident

16  involving -- or at least allegedly, but not --

17          THE COURT: Not on this incident, you don't think?

18          MR. WATSON: I don't believe so.

19          THE COURT: Ms. Everhart?

20          MS. EVERHART: The only other testimony, and it was

21  not directly -- because Mr. Black was the only witness to this,

22  but Mario Woods did confirm that he had not paid for the last

23  amount of cocaine that he had received from Lloyd and his

24  associates, so insofar as that corroborates what Mr. Black said.

25  But no other direct testimony on this particular point.

1          THE COURT:  Well, there's no question in my mind that

2   it was money owed to Mr. Lloyd and associates based on the

3   testimony.  The issue of whether Mr. Lloyd was actually there at

4   the house, I guess is that the --

5          MR. WATSON:  Yes, sir.  Exactly.

6          THE COURT:  -- the question or the point?

7          Ms. Everhart?

8          MS. EVERHART:  Your Honor, I think the testimony is

9   clear:  He said that Mr. Lloyd and this person named Blacks

10  came, the both of them, looking for Mr. Woods.

11         THE COURT:  All right.

12         MS. EVERHART:  And that they had guns.

13         MR. WATSON:  Judge, I --

14         THE COURT:  Hmm-hmm.  Go ahead.

15         MR. WATSON:  I'd just point out that Mr. Black

16  certainly didn't say Mr. Lloyd's name.  And the question and

17  answer in Lines 15 through 18 certainly is not clear that he's

18  agreeing with that entire, what was a leading question that was

19  unobjected to, but a leading question nonetheless.

20         THE COURT:  Well, I'm going to amend it just to say

21  that, at the very least, an associate of Mr. Lloyd's came to

22  Black's house, and handle it in that way.  That, I think,

23  accomplishes the clarity that you're seeking.

24         MR. WATSON:  Yes, sir.

25         THE COURT:  All right.  Now you have 24.  Defendant's

1  objecting to 20 pounds of marihuana, asserting there's

2  inconsistent testimony because Mr. Scott testified about this

3  incident but Mr. Black did not.  And this is Paragraph --

4  Page 456.  Mr. Watson, happy to hear from you.  Is there

5  anything else on that?  456 is Mr. Scott, and --

6          MR. WATSON:  Yes, sir.  I'd just say that Mr. Scott

7  did testify an approximate weight, 20 to 30 pounds, and it

8  appears from his testimony that Mr. Black was involved in this

9  incident and Mr. Black did not testify as to this incident -- at

10  least I don't believe he did -- at all.  And would just suggest

11  to the court, since Mr. Black didn't testify and Mr. Scott used

12  words of "probably", "about", 20, 30 pounds, very imprecise

13  amount, certainly doesn't appear on the transcript as being

14  certain as to the amount, that this amount should not be

15  attributed to Mr. Lloyd.

16          THE COURT:  When you say Mr. Black didn't testify to

17  this amount, you mean he wasn't asked about it?  There was no

18  testimony at all?  You don't mean he was asked about it and he

19  didn't specifically reference the amount?

20          MR. WATSON:  I meant the former of the two.  I don't

21  believe he was -- from my review of the transcript, he was not

22  asked about this event.

23          THE COURT:  Okay.  Let me hear from Ms. Everhart.

24          MS. EVERHART:  Your Honor, I had thought that

25  Mr. Black had testified as to those facts, but I couldn't find

1 it either, and I couldn't find that I had even asked him about

2 it. But Mr. Scott was very clear, and of course he had fewer

3 dealings with Mr. Lloyd than Mr. Black did and seemed to have a

4 good recollection of what happened, and he did say 20 or

5 30 pounds, and that is why he was attributed in the presentence

6 report with the lower of the two, which is the 20 pounds. But

7 there certainly was credible testimony to support that

8 paragraph.

9             THE COURT: Well, okay. Thank you.

10            Again, the government has the initial burden of

11 establishing evidence that would justify inclusion of the facts

12 in the presentence report. The government has the burden of

13 proving this by a preponderance of the evidence. The defendant

14 then has an affirmative duty of showing the information is

15 unreliable. The articulated reason for suggesting unreliability

16 is simply the fact that there's an absence of any inference by

17 Mr. Black. But that doesn't -- perhaps it goes to weight, but

18 it doesn't in any way undermine, in my mind, a preponderance of

19 the evidence finding on this testimony.

20            When I look at it, Page 456, the question is asked of

21 Mr. Scott, "Sometime after this trip to New York that you just

22 described, did you speak to Black about him using your garage

23 for anything?"

24            He says "Yes."

25            "What happened?" is asked.

1     Then he says "He brought some marihuana there, and we

2 looked at the marihuana and Mr. Lloyd came by and the marihuana

3 wasn't any good, so we had took it away.

4     "Question:  And Mr. Lloyd took it away?

5     "Answer:  Yes.

6     "And how much marihuana are we talking about there?

7     "Answer:  It was a bail of it.  You know, a big bail.

8     "Question:  Could you estimate approximately how much

9 that might have weighed?

10     "Answer:  Probably about 20 to 30 pounds."

11     So I do find that the government has sustained its

12 burden, and that objection is overruled.

13     That brings us to, I think, the largest of these

14 objections, probably, and that deals with the 400 kilograms of

15 cocaine that is attributed to the defendant in Paragraph 27.

16 Paragraph 27 says that "In the spring of 2008, Lloyd advised

17 Black that the Mexicans need a truck to go to Houston for a drug

18 pickup.  Scott and Black made contact with Trenton Hawkins and

19 arranged the travel plans, flew to Houston, Texas ahead of time.

20 Black and Hawkins' roommate" -- I guess it was Jay Rock --

21 "drove to Houston, Texas together in a minivan while Hawkins and

22 his driver drove in a tractor trailer from Hawkins'

23 transportation business.  They were supposed to receive 1,500

24 pounds of marihuana and 400 kilograms of cocaine.  The Mexicans

25 could not get over the border so the deal was not conducted.

1 Hawkins was angry, so the Mexicans gave Black about 40 pounds of

2 marihuana to pay off Hawkins. In order to avoid any possible

3 double-counting, Lloyd and Scott are not attributed with the

4 marihuana negotiated that they expected to receive; however,

5 they're each attributed with the 400 kilograms of cocaine they

6 were supposed to purchase in this transaction, because the deal

7 had been made, and Lloyd and Scott had the means to complete the

8 transaction."

9         This is Page 271 of the transcript, I think.  So let's

10 look at that.  I understand we also some debriefs from Mr. Black

11 on this issue, but the defendant's arguing that the trial

12 testimony sort of undercuts the debriefs, as I understand it.

13         MS. EVERHART:  Your Honor, if I might sort of cut to

14 the chase here:  It's not the United States' position that the

15 defendant should be attributed with the 400 kilos of cocaine.

16 That is what he said in his debriefs and that's why it ended up

17 in the presentence report.  But at trial he, when he was under

18 oath, said, well, I don't know exactly what the amount of

19 cocaine was involved, and he was very wishy-washy, and I would,

20 I would not say that that is sufficient to sustain that

21 400 kilos.

22         THE COURT:  All right.  The defendant's objection is

23 sustained.

24         Then we come to Paragraph 28.  The defendant is

25 objecting to a factual statement that he paid Hawkins' expenses

1  for drug transportation. Paragraph 28, "Daugherty and Lloyd

2  wanted to make another trip to El Paso, Texas, and, in order to

3  use Hawkins' truck, they paid Hawkins $4,900 in advance for

4  fuel. Black received the money through Western Union and

5  moneygrams in different names, from different places. Black

6  would receive text messages ahead of time telling Black what

7  names were used for the wire transfers and Black would then pick

8  them up. The money for these wire transfers came from

9  Daugherty."

10         Pages 944 to 945 in the trial transcript are the

11  applicable cross-references. This is Hawkins testifying about

12  wanting to get his money, and he's asked, "What did Sammy tell

13  you?" After he says he wanted to get his money and he had this

14  argument, and he says he said he had to talk to 'Cuz and he'll

15  get back with me. We got into an argument over it. One thing

16  led to another and I seen everybody by Military Circle Mall.

17  I'm paraphrasing, I'm not quoting 100 percent here.

18         "When you say 'everybody', who did you see?" He says

19  Black and Sammy and others. Then when I pulled up, when I

20  pulled up, Sammy and I talked and he said that he was going to,

21  you know, he was going to get my money for me. And eventually I

22  wind up getting my money.

23         "Question: And who was it that actually gave you the

24  money?

25         "Answer: I got the money, as far as Black brought the

1 money to me.

2          "Question:  But did Black tell you where the money

3 came from?

4          "Answer:  Well, Sammy told me he was going to get me

5 the money.

6          "Question:  Did he say -- go ahead.

7          "Answer:  Sammy told me he -- when I -- like I say,

8 when we got in this dispute, he said I'll take care of you.  He

9 said I'm going to get you money.  And I wind up talking to Black

10 about it, and eventually, like I say, I wind up getting the

11 money.  Black brought the money to me."

12          All right.  Mr. Watson?

13          MR. WATSON:  Judge, I'd just point out that

14 Mr. Hawkins specifically said, I guess Line 16 on Page 945, they

15 gave me $4,900.  Doesn't really specify who gave it to him.

16 With the use of the pronoun "they", it's, it's just not clear

17 who actually gave him the money.  There's -- it may not make

18 much difference whether we identify the person who gave him the

19 money or the sourcing of the money, I realize this may just be

20 semantics, but I think it's clear that Black actually gave him

21 the money, and it's unclear where Mr. Lloyd was at that point in

22 time.  Whether or not Mr. Lloyd was the source of the money or

23 had previous conversations with Mr. Hawkins about the source of

24 the money is somewhat of a different issue.  But just wanted to

25 make it clear that Clive Black actually handed him the money.

1 And beyond that, that Mr. Hawkins certainly can testify to what

2 conversations he had about it, but he didn't really know the

3 source other than he got it from Clive Black.

4          THE COURT:  All right.  Ms. Everhart?

5          MS. EVERHART:  Your Honor, I feel that it's clear from

6 Mr. Hawkins' testimony that Black was nothing more than an

7 errand boy for Mr. Lloyd.  It was Mr. Lloyd who owed him the

8 money, it was Mr. Lloyd who assured him he would get the money,

9 and he just had Black deliver it eventually as opposed to

10 delivering it in person, and this shows you what the role of

11 these two individuals were one to the other.  So we would submit

12 that there is sufficient evidence to support that paragraph.

13          THE COURT:  I agree with that.  Could it have been

14 clearer?  Yes.  But I think it meets the standard to be

15 included, although I'm not sure that it has a direct bearing on

16 the guidelines.  But I will overrule the objection.

17          Then we get to Paragraph 30.  Defendant's objection to

18 eight ounces of marihuana.  Paragraph 30 says -- this is with

19 respect to UC-20.  Any issue about divulging that identity?

20          MS. EVERHART:  No, Your Honor.

21          THE COURT:  "In July, 2008, Bruce Heyward, UC-20, went

22 to Lloyd's residence in Atlanta, Georgia.  Lloyd advised Heyward

23 that he wanted to sell vans that he had used when he had an

24 energy drink company.  Heyward and Lloyd discussed transporting

25 narcotics at that time.  While Heyward was at Lloyd's residence,

1   he observed one half to one pound of marihuana on a table.

2   Based on this issue, Lloyd is attributed with 226.8 grams of

3   marihuana."

4          Mr. Watson?

5          MR. WATSON:  There was no testimony at trial regarding

6   this incident, and I don't have in my possession any

7   indication -- or any document indicating that this took place.

8   Mr. Heyward didn't testify before the Grand Jury.  So would just

9   submit to the court, without any mention of it at trial, I do

10  not know where this allegation originated.

11         THE COURT:  All right.  Ms. Everhart?

12     .   MS. EVERHART:  Your Honor, he was -- Mr. Heyward was

13  not asked about it at trial.  It's only a half-pound of

14  marihuana and it's not going to have any effect on the guideline

15  calculation, and so if the court just wants to disregard that

16  paragraph, we have no objection.

17         THE COURT:  Well, that makes it very easy.  I'll just

18  put an X through Paragraph 30.

19         Then we come to -- I think the original objections on

20  Paragraphs 37 and 38 were withdrawn by the defendant, so now

21  we're up to Paragraph 42 and 43.  And the defendant is objecting

22  to 1,000 pounds and 4,000 pounds of marihuana being referenced.

23  And --

24         MR. WATSON:  Judge, if I could interject?  I believe

25  we also had objections to Paragraph 39 -- Paragraphs 39 and 40

1  with regards to the gun.

2        THE COURT:  I'm going to get to that.  I'm just doing

3  the drug weights now.

4        MR. WATSON:  Oh.  Yes, Your Honor.

5        THE COURT:  So will the next then be 42 and 43, Mr.

6  Watson?

7        MR. WATSON:  Yes, sir.

8        THE COURT:  Okay.

9        MR. WATSON:  Judge, if I could have a minute?  I'm

10 trying to keep up with the court with the transcripts.

11        THE COURT:  All right.  Let's look at these

12 paragraphs.  "On July 31, 2009 case agents conducted

13 surveillance at the Applebee's restaurant located at the

14 Stonecrest Mall in Lithonia, Georgia, where CW-15 was set to

15 meet with Lloyd.  At approximately 1:41 p.m. Lloyd was observed

16 meeting with CW-15 inside the Applebee's.  During their meeting,

17 Lloyd and CW-15 discussed that Lloyd and 'his people,' referring

18 to Lloyd's Jamaican co-conspirators, were anxious to finalize

19 arrangements for the transportation of the marihuana.  Lloyd

20 felt comfortable with CW-15, and the minimal weight requirement

21 for the marihuana was no problem with Lloyd's organization.

22 Lloyd advised that the organization handled way more than the

23 minimum, referring to the 1,000-pound minimum.  Lloyd agreed he

24 would be doing business and it would probably be Houston, Texas

25 pickup and somewhere in Maryland for a drop location.  During

1  the meeting, Lloyd contacted a suspected co-conspirator and

2  began speaking in Fatwa, a Jamaican dialect.  Lloyd relayed that

3  his partner was smiling and ready to do business.  Lloyd advised

4  CW-15 that Lloyd had to vouch for him or her, and both of their

5  families would be seriously harmed if anything went wrong or if

6  CW-15 was 'working for the man.' Lloyd advised that his partner

7  wanted to see the false compartment utilized to hold the

8  marihuana, and would be willing to meet with UC-19 in Tuscon,

9  Arizona.  Lloyd advised he would meet UC-15 to confirm when to

10 arrange the meeting with UC-19 and his partner.  Based on the

11 above information, Lloyd is attributed with 1,000 pounds or

12 453.6 kilograms of marihuana."

13         That is followed by Paragraph 43.  So that was

14 July 31st, 2009.  Then we come to Paragraph 43.  "On

15 September 29th, 2009, CW-15 had three separate telephone

16 conversations with Lloyd.  During these conversations, Lloyd

17 asked CW-15 if his or her transportation partner was in Arizona.

18 Lloyd also said that they had things ready in Amarillo, Texas

19 for the pickup of approximately 4,000 pounds of marihuana.

20 CW-15 advised Lloyd that the transportation fee would be fifty

21 dollars per pound with five dollars per pound given to Lloyd and

22 the remaining $45 going towards the transportation fee.  CW-15

23 told Lloyd that he/she, he or she, would have his or her partner

24 contact Lloyd in the morning.  The next day, an ICE agent acting

25 in an undercover capacity made telephonic contact with Lloyd and

1  discussed the potential transportation services needed by Lloyd.

2  Based on the above information, Lloyd is attributed with 18 --

3  1,814.4 kilograms of marihuana, or 4,000 pounds."

4          All right.  So Mr. Watson, happy to hear from you on

5  this.  There's no, no transcript issue or reference here, is

6  there?

7          MR. WATSON:  Judge, I believe with regard to the

8  thousand pounds, that is, there was some testimony from

9  Mr. Heyward starting on or about Page 703.

10          THE COURT:  All right.  Why don't you step to the

11  podium with that.  And Ms. Everhart, you're welcome to step to

12  the podium and look at that as we kind of go through it.  703?

13          MR. WATSON:  Yes, sir.

14          THE COURT:  Okay.  What line are we on now?

15          MR. WATSON:  I believe Line 4.

16          THE COURT:  Okay.  So during your first -- question to

17  Mr. Heyward from Ms. Everhart:  "During your first conversations

18  with Mr. Lloyd, this being July of 2008, what did he indicate

19  that he wanted you to do?

20          "Answer:  Transport some marihuana from Texas area out

21  into Virginia, Baltimore and D.C. area.

22          "And did he say how much he was interested in having

23  transported?

24          "Answer:  Initially it was supposed to be a small

25  load, which was supposed to have been a test run.

1          "Question:  When you say a "small load", what are you

2   talking about?

3          "Answer:  I think he mentioned 300 pounds or so.

4          "And what is a test load?

5          "Answer:  I guess that was the, to see if we can make

6   it, you know, through safely.

7          "Question:  Did he act that he was anxious that this

8   happen quickly?

9          "Answer:  Yes.  Yes.  He was kind of in a hurry for it

10  to get done.

11         "Question:  And what did you, how did you respond to

12  him when he talked about 300 -- d 300-pound load of marihuana?

13         "Answer:  I told him that the driver said it wouldn't

14  even be worth his while.

15         "Question:  So what was the minimum?

16         "Answer:  He would, the minimum would be 1,000 pounds

17  or more."

18         And the question:  "And did you discuss with him a

19  price for this transportation?

20         "Answer:  Yes.  The price was, I think, $150 per

21  pound, and that seems to be too much that he was, you know,

22  talking about."

23         Does that cover it?

24         MR. WATSON:  Judge, actually I think it goes on for a

25  number of pages, maybe 10 or more, describing contacts between

1 Mr. Heyward and Mr. Lloyd subsequent to that conversation.

2         MS. EVERHART:  And Your Honor, if you look at

3 Page 706 -- and this would be at Line, I guess starting with

4 Line 8 and it mentions again a thousand dollars a pound, and

5 they had reduced that -- not finder's fee, the fee that was

6 supposed to be paid on that to fifty dollars a pound, and that

7 Mr. Lloyd was supposed to get a kickback of five dollars a

8 pound, and that was satisfactory to him.

9         THE COURT:  Okay.  And what about that, Mr. Watson?

10 I'm looking at it.  It does seem to indicate that.

11         MR. WATSON:  Yes, sir.  I would just point out that

12 what has to be proven by a preponderance of the evidence is that

13 there was an agreement.  And I would contend that we need an

14 agreement as to all the terms of the deal.  And I know that the

15 question was specific, the question was a specific agreement,

16 but the response was just -- I believe what it's saying is it

17 would be fifty dollars per pound for transportation, but we

18 don't have any further evidence of the agreement.  For example,

19 Line 18, "Did you try to finalize exact locations?

20         "Answer:  No.  No, I can't say we finalized it."

21         So certainly doesn't sound like they had the where,

22 the what or the when.

23         MS. EVERHART:  Your Honor, it's not a question of

24 really whether they came to a meeting of the minds, the question

25 is more what was the amount under negotiation.  And the amount

1  under negotiation was clearly 1,000 pounds.

2      THE COURT: And isn't the question whether there's

3  evidence to show that there was the capacity to do it, which

4  suggests the realistic possibility of it taking place. That, I

5  think, is also a -- I'll look back at the legal standard and

6  quote it, but I think that is part of it.

7      MS. EVERHART: Well, Your Honor, the fact that this

8  same group of people managed to deliver 1,700 pounds of

9  marihuana to this area from Texas in the same time frame shows

10 that they had some ability to do this. Furthermore, it was

11 right around this time Mr. Lloyd was found at the Phoenix

12 airport with $100,000 sewn into the lining of his suitcase, so

13 there clearly was money involved. And we would submit that

14 there is a great deal of evidence that these people were, in

15 fact, capable of moving huge amounts of marihuana because they

16 had done -- they did so.

17     MR. WATSON: Judge, my response would be, of course

18 they had the potential to do it because we have a count he was

19 found guilty of where they did move a large quantity of

20 marihuana. And that certainly can be considered. I'm not

21 suggesting it cannot be considered. But would just further

22 state to the court that the court has to look at each

23 transaction separately, and that there should be at least some

24 proof that this was more than just talk. And we simply don't

25 have anything other than conversations here.

1        THE COURT:  Okay.

2        MR. WATSON:  Some exact statements as to some terms,

3 but certainly not all of the terms.  And we don't have -- as I

4 said before, pickup, drop off, when it was going to happen,

5 certainly things that would make that a more precise type of

6 agreement and may suggest that they did have the means.

7        THE COURT:  Okay.  So you all stay there.  I like

8 having you both there to address it.

9        This is still 2D1.1 that we're dealing with, I think.

10 And there's an Application Note 12 that states that "If a

11 transaction was planned and agreed upon but the transaction did

12 not occur and the defendant establishes that the defendant did

13 not intend to provide or purchase, or was not reasonably capable

14 of providing or purchasing the agreed-upon quantity of the

15 controlled substance, the court shall exclude from the offense

16 level determination the amount of controlled substance that the

17 defendant establishes that he was not reasonably capable of

18 providing or purchasing."

19        So sort of a two-pronged standard.  If the transaction

20 was planned and agreed upon, but then it doesn't -- so if it was

21 planned and agreed upon first, and then the question was whether

22 or not, in the context of this objection, the defendant was

23 reasonably capable of providing or purchasing the agreed-upon

24 quantity.  And Mr. Watson, your point is there was no agreement?

25 First that's your first point?

1          MR. WATSON:  Yes, sir.

2          THE COURT:  Now, Page 706 -- okay.  Page 705 asks "Was

3  there a face-to-face meeting eventually?

4          "Yes.

5          "Where did it occur?

6          "Applebee's.

7          "Could you tell us what happened and what was

8  discussed during the Applebee's meeting?

9          Answer by Mr. Heyward:  "During the Applebee's meeting

10  it just, basically working out the numbers and where exactly

11  that he wanted the transportation of marihuana to be and

12  whatever state.  Also the fact that he wanted to deal with me on

13  a one-on-one basis as far as with the money.  He didn't want to

14  deal with anyone, anybody else, you know, as far as on the

15  money.

16          And did you come up with any specific agreement as to

17  the quantity and how much was going to be paid per pound?

18          "It was -- he stated it would be over a 1,000 per

19  pound.  And the agents said, they set the price at fifty

20  dollars, which he agreed and he was going to get a kickback of

21  five dollars per pound on his end.

22          "Okay.

23          "Answer:  So he was pretty satisfied with that.

24          "Question:  So fifty dollars -- well, actually fifty

25  dollars a pound was going to be paid, but he would get five

1  dollars out of that for each pound?

2          "Answer:  That's exactly right.

3          "Question:  And did he, did you try to finalize exact

4  locations as to where this pickup was going to occur?

5          "No.  No.  I can't say we finalized it.  It just was

6  up in the air still.

7          "Question:  Did he tell you where, generally where the

8  marihuana was located?

9          "Answer:  Yeah.  In Texas.  I can't remember what part

10 of Texas, but I know it was somewhere on the bottom part.

11         Well, I'm going make a statement, and then if you want

12 to respond to it you can, Mr. Watson, but it seems to me there's

13 an agreement with respect to a deal.  The question at Page 706,

14 Line 18, "Did you try to finalize exact locations?"  That's what

15 it doesn't seem there was an agreement on.  And you may want to

16 point me to something else, but what's your response to that?

17 Or is there anyplace else you want to point me to?

18         MR. WATSON:  I would say that my recollection of the

19 rest of the testimony was that from that point forward there

20 were a lot of calls back and forth, as I remember it correctly,

21 and nothing ever obviously came of it, or we wouldn't be having

22 this exact discussion if anything came of this; but that that

23 was basically the end of the specifics.  And --

24         THE COURT:  Well, look at 707, the bottom of Page 707.

25 During this conversation in Applebee's there's a telephone call

that comes in, and Mr. Lloyd accepts the telephone call, and

once he gets off the phone, Mr. Lloyd, according to Mr. Heyward,

stated "That his people was smiling through the phone on the

other end."

And question: "Now after he said, was talking about

his partner, did he indicate what the partner wanted to far as

look at the truck?

"Yes, his partner wanted to see the truck, because we

told him that we had a trap inside the truck which was

considered a toy, and you know, he wanted to see it for his self

to make sure, you know, that everything was good."

They talk about that more.

I guess my point is there seems to me there can be an

agreement on the purchase and sale and let's work out the

details, and that's what all this seems to be talking about.

And I understand how you could, you know, look at that and try

to characterize it as, well, there's not a total agreement

because the details hadn't been worked out completely on how

it's going to be accomplished, but it seems to me from what I

see that there was an agreement to do the deal.

MR. WATSON: If I could just point out one other

issue? And that is there were a series of recordings that were

played, discussions between Mr. Lloyd, Mr. Heyward and then

discussions between Mr. Lloyd and another gentleman. I don't

have his name in front of me right now. But these recordings

showed basically time and time again that nothing ever happened.

And would just ask the court to consider those recordings with

this Applebee's conversation. And not only did things not

happen or there was no further agreement, but I would submit to

the court it seemed clear that Mr. Lloyd was putting them off

and didn't certainly didn't have the means to complete the

transaction. And we sat through several of those calls where of

course the government informants were trying to get the

transaction completed, and time and time again nothing came of

it, and wanted -- basically excuse one excuse after another was

made that we're going to do business, we'll do it soon but we

can't do it now, over and over again.

THE COURT: All right. So we're moving on to sort of

the second prong of the test? Was he capable of doing it.

MR. WATSON: Yes, sir.

THE COURT: Well, he had already done the 1,700-pound

deal. Or was that later?

MS. EVERHART: No, that was earlier, Your Honor.

THE COURT: That had been earlier.

MS. EVERHART: Yes, sir.

THE COURT: So he had already done that. So I don't

think -- you know, my view is there's no question about the

1,000 pounds. There was an agreement and he was capable of

doing it. So that's, from my standpoint the objection is

overruled on that. Then we have the 4,000-pound issue. Is

1   there any transcript reference on that?

2          MS. EVERHART:  Yes, Your Honor.  I have some in my

3   position paper.  That would be, I believe, 756 to 757 and 765.

4   This would be the testimony of the undercover ICE agent.  And

5   there was also mention of it by Mr. Heyward around Page 707 and

6   708 because he talks about making the introduction of the

7   undercover agent to Mr. Lloyd.

8          THE COURT:  And this is separate from the thousand?

9          MS. EVERHART:  Yes.

10         THE COURT:  All right.  755, Ms. Everhart, you say

11  that that -- Heyward says "I start having telephonic

12  conversations with a subject by the name of Sam Lloyd.

13         "Question:  When did that begin?

14         "Answer:  I want to say it began sometime July, 2009."

15         And then you asked him about August 1st, 2009 whether

16  he had any conversations with either Sam Lloyd or with a person

17  named D.

18         "Answer:  Yes, in August I did have a conversation

19  with Sam Lloyd.  Basically what Mr. Lloyd was doing was trying

20  to get me together with a subject by the name of D who had large

21  amounts of marihuana that he needed transported cross-country."

22         So this is a separate transaction from the thousand

23  pounds?

24         MS. EVERHART:  Yes, sir.

25         THE COURT:  "Question:  Did he ever work out any

1   details with Mr. Lloyd?

2           "Answer:  Throughout our conversations we worked out

3   details in regards to the price, the amount, where it was going,

4   how much money he would be taking off the top from, off my

5   transportation fee.

6           "Question:  And when you were talking in August, what

7   sort of figures were you talking about?

8           "In that time frame I want to say there was, there's a

9   couple figures out at that time period.  I think it was fifty

10  dollars, 50 or $75 per unit, which would mean per pound of

11  marihuana to be transported up to the east coast.

12          "Question:  And what's the quantity that was being

13  discussed?

14          "Answer:  At different times they, we've discussed

15  quantities ranging from, I want to say 500 pounds up to

16  4,000 pounds.

17          "Question:  Did you lose contact after a period of

18  time?

19          "Answer:  Yes, I did, a long period of time.

20          "Question:  Was contact reestablished at the end of

21  September, 2009?

22          "Answer:  Yes.

23          "Question:  How did that happen?

24          "Again, what happened is I reached out to Mr. Lloyd --

25  or I don't know if he reached out to me, and we start talking

1  again about it.  I asked him if his associate named D was ready

2  to finally make the transaction happen.  He said they're ready.

3  The stuff hasn't moved, and they're ready to go at any given

4  day.

5            "Question:  Now, there were a series of phone calls

6  between you and Mr. Lloyd that were recorded, and I'd like to go

7  through some of those now."

8            That's not in the transcript, of course.  Did that

9  shed any particular light on the amount or the agreement?

10           MS. EVERHART:  Your Honor, if you continue to Page 757

11  I ask the agent, Agent McKenna, about the phone call that

12  occurred between he and Mr. Lloyd, I believe, on the 29th of

13  September, and he says, if one looks at Line 8, the question is

14  "And you also talk about, still talking about four.  What's that

15  a reference to?"

16           And the answer is "Reference of four is 4,000 pounds."

17           THE COURT:  Do you have the -- I mean, because what we

18  just read before was a range of 500 pounds up to 4,000 pounds.

19  Now we, we have the audio exhibit played and then we have a

20  reference to a reference.  And that's what I have before me.

21           MS. EVERHART:  Well, Your Honor, I was asking him to

22  explain what was being meant, and this was, they were talking

23  about trying to set this trip up again.  And in the transcript,

24  if one looks at the transcript of that conversation there was a

25  reference that's made by one of the participants to four, and

1  the agent says that reference to the 4,000 pounds.

2  THE COURT:  Do we have that?

3  MS. EVERHART:  The trial transcript?

4  THE COURT:  Yeah.  The audio.  Because it's not in the

5  transcript of the trial because we had an audio exhibit.

6  MS. EVERHART:  Your Honor, it would be, the transcript

7  would be in evidence.

8  THE COURT:  We don't have it here with us.

9  MS. EVERHART:  I believe that transcript would have

10 been Exhibit 25B.  It would have been either 25B, 25D, 25F.

11 There are a number that were on that date.  But it would be one

12 of those.  And I believe it would be 25D, actually.  Because I

13 moved -- after that, after that testimony, I moved for admission

14 of 25C, which is the recording and D which is the transcript.

15 THE COURT:  All right.  Well, let's -- I think we all

16 probably need a break by now.  Let's get that.  We knew we were

17 going to be here for a long time when we started with all of

18 these objections, and we're just going to continue to work our

19 way through them.  We'll take a break and we'll get that and be

20 back when we have it.

21 Madam Clerk, would you let me know?

22 (Recess taken from 11:54 s.m. to 12:14 p.m.)

23 THE COURT:  I guess you all want me to take a look at

24 this transcript?

25 MS. EVERHART:  Yes, Your Honor.  The reference is on

1  the second page of the transcript.

2          (Pause in the record.)

3          THE COURT:  Okay.  Mr. Watson, do you want to call my

4  attention to anything in here?  Again, we're looking now, for

5  the record today, at transcript, Government Exhibit 25D as in

6  David.

7          MR. WATSON:  Judge, I have reviewed the transcript,

8  and there are some specifics in there as to amount, and I guess

9  certainly -- well, there's talk about doing it in the next day

10 or so.  I would point out, though, that there are several

11 conversations that took place over the next several days where

12 Mr. Lloyd put Mr. McKenna off with, I guess you could say, every

13 excuse in the book:  I'm in a meeting, you need to call this

14 person, or this person's going to call you back or this person's

15 in a meeting.  Clearly if the court would recall actually

16 hearing the tapes, I think it was quite clear that there wasn't

17 much intention to go forward with anything.  Again, it was just

18 one excuse after the other.  And we would just suggest to the

19 court that even though the language in the transcript is

20 certainly more precise than what was testified to, that it

21 certainly was not the end agreement, because they went back and

22 forth time after time over the next few days over several phone

23 calls trying to determine when this was going to happen and who

24 Mr. McKenna was going to be involved with to make it happen.

25          THE COURT:  Is there any other specific language in

1  this exhibit that you wanted to point me to?  If not that's

2  fine.  I just want to make sure I'm looking at what you want me

3  to look at.

4          MR. WATSON:  Nothing else in that specific exhibit.

5          THE COURT:  Okay.  Ms. Everhart?

6          MS. EVERHART:  Your Honor, I think that it's pretty

7  clear that both Mr. Lloyd and his associate, who is referred to

8  as D in these transcripts, were both very serious about this.

9  There were 14, as I count them, recorded telephone conversations

10  occurring beginning, I believe, on September the 29th and going

11  up through the end of the first week of October trying to work

12  out the details.  And of course I think it's pretty clear that

13  4,000 pounds was the amount that was under negotiation between

14  this group, and the fact that it never came to fruition is no,

15  is not what the standard is.  The standard is whether there was

16  an ability to follow through and whether there was an agreement,

17  and there clearly was an agreement.  And I think that it has

18  been aptly, amply demonstrated that these people had the

19  capability of moving huge amounts of drugs.

20          THE COURT:  Based on --

21          MS. EVERHART:  Based upon, for one thing, the

22  1,700 pounds that they were able, back in 2008, to bring up

23  here, and the fact that, if the court recalls, there was large

24  amounts of cash that were confiscated from various

25  co-conspirators during this.  In fact, I think almost a million

1  dollars in cash was seized if one adds up all the quantities of

2  money taken from these various conspirators, including Trent

3  Hawkins and some of the people. One woman who was stopped with

4  240-some-odd thousand dollars worth of cash in the car, that

5  they had the means and the ability to follow through on this.

6       THE COURT: Okay. Mr. Watson, I failed to ask you

7  this, but why -- you said that Mr. Lloyd was making up every

8  excuse in the book to try to not do this. Refresh me on why and

9  what you think supports that.

10      MR. WATSON: There were a series -- well, there were

11 further recordings.

12      THE COURT: I know there were many conversations. But

13 why? Was he doing it -- is there any evidence about why he was

14 putting him off? Why he was engaging in all these conversations

15 if he wasn't serious about it?

16      MR. WATSON: Judge, I would just suggest to the court

17 that he may have been hopeful that this was going to take place,

18 but that he was unable to complete the transactions or make the

19 final arrangements, ever, because he simply didn't have the

20 means to do so.

21      THE COURT: Okay. I understand. Well, again, it

22 seems to me that 25D reflects, along with everything else that

23 we've looked at, an agreement on the 4,000 pounds, and based

24 upon the monies that were part of this whole conspiracy, the

25 1,700 pounds having been done already, I don't think it's

 1  unreasonable to conclude that the defendant was reasonably

 2  capable of closing this deal.  And so I do overrule the

 3  objection with respect to the 4,000 also.

 4          Now that brings us to, I think, Paragraphs 112 and 113

 5  and defendant's objection to four kilograms and seven kilograms

 6  of cocaine.  And as I understand the objection, again, it is

 7  that -- you all tell me if I'm wrong, Mr. Watson -- but just

 8  really that there was no evidence presented at trial.  If

 9  there's some testimony you want me to look at, that's fine, I'll

10  look at it, but it, is that basically it, just that there was no

11  testimony at trial, or is there something else you want me to

12  look at?

13          MR. WATSON:  Judge, that's our position.  Ms. Everhart

14  did -- or has directed me to some cites in the transcript.

15          THE COURT:  Do you all want to argue that now?

16          MR. WATSON:  Yes, sir.

17          THE COURT:  Okay.  Why don't you come up together and

18  bring the transcript with you.

19          MS. EVERHART:  The first incident involving the

20  four kilograms of cocaine that I believe is Paragraph 112, I

21  direct attention to transcript Pages 283 and 284.  This was the

22  situation where Mr. Napier picks a girl up at the Crown Plaza

23  and brought her back to Barkleaf with four kilos of cocaine.

24          THE COURT:  Okay.  I don't have that page here since

25  it -- I don't think it had been previously cited.  So you all

1  will need to tell me specifically what it is that you're arguing

2  for there and then I'll hear the response.

3          MS. EVERHART:  It begins on Page 283 at Line 21.  The

4  question is.  "Okay.  Now, in September of 2008 did Rabbi or

5  Mr. Napier pick up a girl from the Crown Plaza?"

6          THE COURT:  All right.  Go slow enough for the

7  reporter.

8          MS. EVERHART:  Yes, sir.  And the answer is, "Yes,

9  ma'am."

10          And then the question:  "Tell us what happened on that

11  occasion.

12          "Answer:  They pick up, he pick up a girl and he

13  brought her back to the house and she had four kilos of cocaine.

14          "Question:  When you say "the house", which house?

15          "Answer:  Barkleaf.

16          "Question:  Had you ever met this woman before?

17          "Answer:  No, ma'am.

18          "Question:  What happened after the cocaine was

19  brought back to Barkleaf.

20          "Answer:  You mean the same night?

21          "Question:  Yes.

22          "Answer:  I don't, I can't recall what happened the

23  same night or after."

24          And then later at Line 12, this is on Page 284,

25  "Question:  But what happened to the cocaine that was brought by

1    the girl?

2        "Answer:  It was sold from the house.

3        "Question:  And who sold it?

4        "Answer:  All of us.

5        "Question:  Okay.  And that would include who?

6        "Answer:  Sampson, Rahbi, Sammy and Hinton."

7        THE COURT:  Okay.  And Mr. Watson, do you want to

8    address that issue?

9        MR. WATSON:  I would just point out that we certainly

10   have evidence of four kilograms of cocaine.  That's, we would

11   agree that's a reasonably precise testimony.  And Mr. Lloyd's

12   name is certainly stated here.  But I would also point out that

13   I don't believe there was any other testimony of Mr. Lloyd

14   distributing cocaine or distributing anything, the end

15   distributor, at least.  So the only evidence there is from the

16   entirety of the trial of him being the end-of-the-line

17   distributor would be, I would submit to the court would be this

18   simple statement right here.

19       Of course that's not the end of the analysis, because

20   I certainly understand in a conspiracy you can be held liable

21   for anything reasonably foreseeable in the scope of the

22   conspiracy, and would have to agree that the conspiracy involved

23   both marihuana and cocaine.  On that point we would just point

24   out that Mr. Lloyd was certainly concentrated on the marihuana

25   end of the conspiracy as opposed to the cocaine end, and this

Paul L. McManus, RMR, FCRR Official Court Reporter

1  being the only, I believe, reference to him actually being an

2  end-line distributor.

3  THE COURT: All right. With respect to the

4  four kilograms, I do find that the government has sustained its

5  burden and the objection's overruled with respect to the

6  four kilograms.

7  So then we move on to the seven-kilogram reference.

8  MS. EVERHART: Yes, Your Honor. There was extensive

9  testimony about this situation. This starts at, in the

10 transcript at page -- where were we before? I believe at the

11 bottom of Page 284, and there's a question -- this is at Line 19

12 -- "Question: Okay. Now, on October 29th, and I'll be getting

13 into the next group of photos here -- on September 29th -- well,

14 let me back up for a minute."

15 And he talks about his house -- this is Black

16 testifying -- and he talks about his house being over in

17 Chesapeake which is near the shopping center of the Food Lion

18 shopping center and the Bella pizza place, and there were a lot

19 of photographs introduced of the Ford F-150s there and Black and

20 Wheeler were waiting for a delivery. And then --

21 THE COURT: This corresponds to the video of them

22 standing outside the red trucks --

23 MS. EVERHART: Yes, sir.

24 THE COURT: -- in front of the pizza, Bella Pizza?

25 MS. EVERHART: Yes, sir. And he talks about that.

```
 1   And then when you get down to Page 290, there's a question:

 2   "Okay.  When these, when you were expecting these trucks to come

 3   in from wherever they happened to be, where did you usually

 4   rendezvous?

 5            "Answer:  By the house, by the Barkleaf house.

 6            "Question:  And the Barkleaf house, and did you ever

 7   meet in the shopping center there near your house?

 8            "Answer:  Yes, ma'am.

 9            "And why would you meet there as opposed to Barkleaf?

10            "Answer:  That was in the day, and they wanted to use

11   my garage."

12            THE COURT:  This is testimony of --

13            MS. EVERHART:  Of Clive Black.

14            THE COURT:  -- still Black.

15            MS. EVERHART:  Yes, sir.

16            THE COURT:  Okay.

17            MS. EVERHART:  "Question:  Okay.  Now, on

18   October 29th, 2008 was there a deal involving" -- and it says

19   17 kilos, but it was only alleged to have been seven.  Either I

20   misspoke or that's incorrect.  "Answer:  Yes, ma'am."

21            THE COURT:  Wait.  Read that again.  I'm sorry.

22            MS. EVERHART:  "On October 29th, 2008 was there a deal

23   involving 17 kilos of cocaine?

24            "Answer:  Yes, ma'am.

25            "Question:  Tell us about that.
```