1           "Answer:  Me and Sampson was -- me and Mr. Wheeler --"

2 and then there was an objection, and then going over to

3 Page 291, "Question:  Tell us about that deal that you were just

4 talking about.

5           "Answer:  Me and Sampson was at the pizza place

6 waiting for Daugherty to come in.

7           "Question:  Okay.  And what was he bringing?

8           "Answer:  Cocaine.

9           "Question:  How much cocaine?

10           "Answer:  Seven keys.

11           "Question:  And when you say "keys", that's a

12 kilogram?

13           "Answer:  Kilogram.

14           "Question.  Did he arrive?

15           "Answer:  Yes, ma'am.

16           "Question:  And what happened after he arrived?

17           "Answer:  We went to the house and we opened up the

18 compartment, unloaded it, and take it back to the Barkleaf

19 house.

20           "Question:  When you say "the house", that would be

21 your house?

22           "Answer:  We went to my house.

23           "Question:  And who unloaded that cocaine?

24           "Answer:  Sampson and Daugherty.

25           "Question:  Okay.  And what happened when you got to

1    the Barkleaf house?

2              "Answer:  We sold it from there.

3              "Question:  Okay.  When you say "we", who sold it?

4              "Answer:  Rabbi, Sampson, Hinton, me, Lloyd.

5    Everybody that, associated with that house."

6              THE COURT:  Okay.  And Mr. Watson?

7              MR. WATSON:  Judge, I won't belabor this one.  It's

8    the same argument that we would have to agree this is similar

9    testimony that we heard with regard to Paragraph 112.  So I

10   would make the same argument as to the one I made to

11   Paragraph 112.

12             THE COURT:  Okay.  I do find that the government has

13   met its burden of proof on this, and the objection is overruled

14   and the references will be included.

15             Now, other than your general objection to

16   Paragraph 115 about the drug weights, which is just a total

17   based on everything we've just done, Mr. Watson, the only other

18   thing, as I understand it, is your gun objection.  Perhaps while

19   we're talking about drug weights I think the government may have

20   some additional ones.  So let's do that before we take up the

21   gun issue.

22             So first there's a 220-kilogram of cocaine objection.

23   Which paragraph is that?

24             MS. EVERHART:  Your Honor, these are, the basis of my

25   objection is I think that these things should be included and

  
1 they have not been included.

2          THE COURT:  Okay.  And where is it that you think it

3 should be included?  Any particular place, or...

4          MS. EVERHART:  Well, it would be wherever the summer

5 of 2008 begins.

6          THE COURT:  I guess that's -- we have offense conduct

7 19 in July, 2008.  So...

8          MS. EVERHART:  And then it goes back to 2005 and 2007.

9 So I would say probably, probably after Paragraph 32.

10          THE COURT:  Okay.  Now, so based on Mr. Hinton's

11 testimony that he received cocaine every week from Wheeler,

12 Lloyd and other co-conspirators, you have argued for inclusion

13 of 220 kilograms of cocaine, and this is transcript Pages 781

14 and 782.  All right.  So this is Mr. Hinton and the context here

15 is discussions about what happened at Barkleaf Drive; is that

16 right?

17          MS. EVERHART:  Yes.

18          THE COURT:  All right.  He's asked whether he saw

19 anybody breaking down drugs, and he says at Barkleaf Drive he

20 saw Black break it down and sometimes Sammy.  He'll just be,

21 he'll be present of the narcotics being there.

22          "And when shipments came in, who was in town that

23 normally was not?

24          "Answer:  Mr. Sammy."  That's Page 781.

25          And on 782, "Anyone else?

1          "Sampson.  He'll be coming.

2          "Answer:  One will come in at one time and then

3  another one will fly in after that person here."

4          "Okay.  Around the summer of 2008 up till May of 2010

5  when you were arrested, about how much cocaine were you getting

6  from the people at Barkleaf?

7          "Answer:  I don't like to do the exaggeration, but I

8  can't even keep count.  So I mean, 'cause I was on the move.

9          "Question:  Were you getting grams or ounces?

10         "Answer:  No, ma'am.

11         "Question.  Kilos?

12         "Answer:  No, ma'am.  It was, it was always half a key

13  or better.

14         "How often was that happening?

15         "I say within a week I move five kilos.  Within a

16  week.  That's on a bad day.  If I got a bad day, I probably do

17  about six, seven on a good day."

18         So that's the testimony.

19         MS. EVERHART:  Yes, Your Honor.  And I think what he

20  was trying to say was five kilos a week and at least five or six

21  in a week, because there was later cross-examination on that

22  topic and it was clarified.

23         THE COURT:  Well, previously we have this specific

24  testimony that you've pointed to about, you know, you asking the

25  question about who was distributing and you'd get the response

1    "all of us", who is "all of us", and they would go through each

2    one and list Mr. Lloyd included.  And you have argued that even

3    though there were multiple references, that because of the

4    conspiracy, Mr. Lloyd should be attributed with all of those

5    arguments that we were talking about earlier.  I think, if I

6    understand your argument correctly.

7              MS. EVERHART:  Yes.

8              THE COURT:  Now when we get to this we've got the

9    Barkleaf house where numerous people involved in the conspiracy

10   are getting the drugs from there and distributing.  And it's

11   still a preponderance standard.  You still have to show that, if

12   you want this included with respect to Mr. Lloyd, that it was

13   something that he knew about.  And your argument is he did know

14   about it --

15             MS. EVERHART:  Well, Your Honor --

16             THE COURT:  -- and he participated in it.

17             MS. EVERHART:  I think the standard is if it was

18   reasonably foreseeable to him.  If you look at the beginning of

19   that testimony by Mr. Hinton, the first things he says is when a

20   cocaine load would come in, and he was asked who would be there

21   when the cocaine loads came in and he said both Lloyd and

22   Sampson, that one could come and the other would follow.

23             THE COURT:  Yes?  And so is your argument that both of

24   them should be attributed with this?

25             MS. EVERHART:  Yes, Your Honor.  It was certainly

55

1   reasonably foreseeable to them.  They were at Barkleaf, and

2   there was quite a bit of testimony, some of which I made

3   reference to in my position paper, that they were always -- that

4   Sampson and Sammy were always there at that house at Barkleaf;

5   that Barkleaf was the sort of hub of all of this activity, and

6   the testimony was that they were both involved not only in the

7   distribution of marihuana, but also of cocaine going through

8   that house.

9            THE COURT:  You have included here -- let's see.  You

10  calculated how many weeks?

11           MS. EVERHART:  44 weeks, Your Honor.  I took the, I

12  think I took the beginning of August or something of 2008 and

13  counted the weeks up through the date of Mr. Hinton's arrest,

14  which was in May of 2010.

15           THE COURT:  And came up with 44?

16           MS. EVERHART:  I came up with 44 weeks, yes, Your

17  Honor.

18           THE COURT:  August of '08 to May of '10?

19           MS. EVERHART:  Yes, sir.  I may have started at the

20  beginning of July.  That was just what I was figuring, because

21  most of this didn't really get started until about June or July

22  of 2008.

23           THE COURT:  That's -- am I calculating incorrectly?

24  Let's see, if you take, even if you take August of '08 to August

25  of '09, that's 52 weeks right there.

1          MS. EVERHART:  Yes.

2          THE COURT:  And then from August of '09 to May of

3   2010, that's an additional number of weeks.  You said... isn't

4   that how you said you calculated it?

5          MS. EVERHART:  No, I calculated --

6          THE COURT:  Oh.

7          MS. EVERHART:  Oh, May of -- yeah.  Gee.  Actually,

8   this, I went into law so I wouldn't have to do math.  This is an

9   indication of why.

10          So actually, yes, you're quite right, Your Honor.  I

11   was cutting out a year.  So I guess it should be 52 plus 44.

12          THE COURT:  All right.  Mr. Watson, let me hear from

13   you on this issue.

14          MR. WATSON:  First I'd just point out that if I, by my

15   quick math, that this would be the equivalent of

16   96,000 kilograms of marihuana, which by my other quick math

17   would dwarf the, I believe, about 11,300 kilograms of marihuana

18   that the court has attributed to Mr. Lloyd to this point.  I

19   would certainly suggest that the language here used by Mr.

20   Hinton is not nearly precise enough to attribute a great amount

21   of this great weight.  And I know that the court needs to take

22   the language as it is and wherever it leads is where the

23   language leads.  But this language used by Mr. Hinton was very

24   general in nature both with regard to the quantity and the

25   frequency.  It seemed to be somewhat of a casual remark.

1          And also with regard to Mr. Lloyd's involvement or

2 presence, it's kind of something that may have happened, not

3 something that happened every time, and would certainly take the

4 position that this language used by Mr. Hinton is not precise

5 enough to attribute this weight to Mr. Lloyd.

6          Also, just because drugs passed through Barkleaf does

7 not automatically mean that it's attributed to Mr. Lloyd.  It's

8 only the transactions or the amount of drugs that were

9 reasonably foreseeable to him.  And that doesn't mean every drug

10 or every amount of drug that went through that house or any of

11 the people in the house.  And without more precise testimony as

12 to what his role in this or these transactions were, he cannot

13 be attributed with these amounts.

14          THE COURT:  Okay.  Well, let's look at the, try to

15 look at the law on this issue.

16          The question on this issue, I think, is whether or not

17 the conduct of the co-conspirators, bringing all this there to

18 the Barkleaf address, was reasonably foreseeable to the

19 defendant and should be deemed relevant conduct for purposes of

20 the drug weight calculation.  The guidelines define relevant

21 conduct to include, under A, "All acts and omissions committed,

22 aided, abetted, counseled, commanded, induced, procured or

23 willfully caused by the defendant."  And then B, "In the case of

24 a jointly undertaken criminal activity (a criminal plan scheme,

25 endeavor or enterprise undertaken by the defendant in concert

Paul L. McManus, RMR, FCRR Official Court Reporter

1    with others, whether or not charged as a conspiracy) all

2    reasonably foreseeable acts and omissions of others in

3    furtherance of the jointly undertaken criminal activity."

4            The government is arguing under Subsection B that

5    these were reasonably foreseeable acts of others in furtherance

6    of the jointly undertaken criminal activity.  And the guideline

7    goes on:  "That occurred during the commission of the offense of

8    conviction, in preparation for that offense, or in the course of

9    attempting to avoid detection of responsibility for that

10   offense."

11           "The scope" -- the Notes go on to point out that "The

12   scope of the criminal activity jointly undertaken by the

13   defendant; that is, the jointly undertaken criminal activity, is

14   not necessarily the same as the scope of the entire conspiracy"

15   under Subsection B, "and hence, relevant conduct is not

16   necessarily the same for every participant."

17           "The conduct of others that was both in furtherance of

18   and reasonably foreseeable in connection with the criminal

19   activity jointly undertaken by the defendant is relevant conduct

20   under this provision."

21           It goes on later, "The criminal activity that a

22   defendant agrees to jointly undertake and the reasonably

23   foreseeable conduct are not necessarily identical.  Two

24   defendants agree to commit a robbery, and during the course of

25   that robbery, for example, the first defendant assaults and

1    injures a victim.  The second defendant is accountable for the

2    assault and injury of the victim even if the second defendant

3    had not agreed to the assault and had cautioned the first

4    defendant to be careful not to hurt anyone, because the

5    assaultive conduct was in furtherance of the jointly undertaken

6    criminal activity, the robbery, and was reasonably foreseeable

7    in connection with that criminal activity given the nature of

8    the offense."

9         "With respect to offenses involving contraband,

10   including controlled substances, the defendant is accountable

11   for all quantities of contraband with which he was directly

12   involved, and, in the case of a jointly undertaken criminal

13   activity, all reasonably foreseeable quantities of contraband

14   that were within the scope of the criminal activity that he

15   jointly undertook.  The requirement of reasonable foreseeability

16   applies only in respect to the conduct of others under

17   Subsection (a)(1)(B)."

18        Then it provides various illustrations.  They give in

19   example 7 in the guidelines, "Defendant R recruits Defendant S

20   to distribute 500 grams of cocaine.  Defendant S knows that R is

21   the prime figure in a conspiracy involved importing much larger

22   quantities of cocaine.  As long as S's agreement and conduct is

23   to the distribution of the 500 grams, defendant S is accountable

24   only for that 500-gram amount, rather than much larger quantity

25   imported by Defendant R."  But that's with respect to (a)(1)(A).

1   Mr. Watson, the evidence is pretty clear throughout

2 this trial that Mr. Hinton was -- excuse me -- that Mr. Lloyd

3 was involved in a macro way, I wouldn't say a micro way, in the

4 overall distribution and conspiracy.  And so the government's

5 arguing for the reliability and the reasonable foreseeability.

6 What's your response to that?

7   MR. WATSON:  First, as to the reliability, I would

8 point out that Mr. Hinton also, I think, right after this

9 testimony, testified that he was selling somewhat unbelievable

10 amount of drugs a week.  I think he almost was up to about

11 40 kilograms a week.  And I would submit to the court that his

12 demeanor certainly didn't suggest that he was a reliable witness

13 in all of his testimony.

14   First I would -- as far as Mr. Lloyd's involvement

15 with this particular series of transactions, Mr. Hinton of

16 course only speaks to Mr. Lloyd in a very general sense of being

17 in the, being around, not that Mr. Lloyd had direct involvement.

18 And then going from there is whether or not of course it's

19 reasonably foreseeable based on Mr. Lloyd's other contacts or

20 other involvement in the conspiracy.  Of course Mr. Lloyd during

21 this entire time lived in Atlanta, not Norfolk or Chesapeake,

22 unlike several other members; he was not going to Barkleaf on

23 any type of a daily or regular basis.  He would come into town

24 from time to time, it was alleged, but certainly wasn't here, I

25 don't even believe, on a weekly or even monthly basis.  He would

1   just come every now and then.

2          So I would submit to the court that he should not be

3   held accountable for everything that went through Barkleaf

4   Drive.  Just because these drug amounts were cut there or

5   delivered there and then distributed from there certainly didn't

6   automatically mean that he should take or be responsible for

7   these drug amounts.  So there just needs to be something more

8   than him being in the area to attribute this large drug amount.

9          THE COURT:  Okay.  Thank you.

10          You know, Ms. Everhart, I, I don't -- I'm not

11  comfortable saying that we've reached a preponderance of the

12  evidence on this.  With the reference to the two of them, the

13  fact that Mr. Lloyd was in and out of town...  I know there's a

14  lot of money that you've talked about that was found at various

15  places, but the clarity at Page 71 is lacking for me on a

16  preponderance.  And so I'm going to overrule your objection on

17  this issue.

18          Then you have 12 kilograms of cocaine that you want to

19  have included.  And is this involving a conversion of cash found

20  during the traffic stop of the red F-150 with Massachusetts

21  plates?

22          MS. EVERHART:  Yes, Your Honor.

23          THE COURT:  Okay.  Tell me about that.

24          MS. EVERHART:  This was, there was quite a bit of

25  testimony on this issue.  This involved the traffic stop of

```
 1   Patricia Lanza, and she was driving the red Ford F-150 with

 2   Massachusetts plates that had been also used in the delivery of

 3   seven kilos of cocaine to Wheeler and Black by Daugherty at the

 4   Food Lion center on October 29th, 2008 that we discussed

 5   earlier.  And the 264,000, I converted it -- of course we all

 6   know about my math skills -- but that would convert to a minimum

 7   of 12 kilograms of cocaine.

 8            THE COURT:  Okay.  This was the Lexington police

 9   officer from North Carolina that came and testified?

10            MS. EVERHART:  Yes, sir.

11            THE COURT:  Okay.  And with respect to Mr. Lloyd, the

12   connection there?  We have reviewed the standards in some detail

13   just now.  Do you want to make your argument on that?

14            MS. EVERHART:  Yes, Your Honor.  It's our position

15   that Mr. Lloyd was in a position in this conspiracy that he

16   would know or should have known everything that was going on

17   with these people.  And again, you cannot overlook the

18   connection to Barkleaf, because it was Mr. Lloyd who originally

19   engaged Mr. Black to assist him in finding a house.  The

20   testimony of Johnny Cowan was that he took Mr. Lloyd around

21   looking at places and was trying to get Mr. Lloyd to rent one of

22   his rental houses that he had, but Mr. Lloyd was not interested

23   in that, and eventually Mr. Lloyd and Mr. Black prevailed upon

24   the person who had, who was the lease holder at Barkleaf to let

25   them use that location.
```

1    It was the testimony was of almost every witness in

2  this case, not just Mr. Hinton, but also Mr. Black and also

3  Mr. Todd, who lived at that Barkleaf house for a period of time,

4  that every time a load came in, he had to move out because he

5  wasn't supposed to be there, and Mr. Lloyd and Sampson and the

6  rest of these people would come in.  They did not live at the

7  house, there was no reason for them to be at the house except

8  when there were drugs in town, and the testimony was that when

9  there were drugs in town, Sampson and Sammy were in town.

10    And there was also testimony from Clive Black and also

11  from others that he collected the drug proceeds from the various

12  people who were doing the street sales and would deliver them to

13  Wheeler or Lloyd or Napier, because they were, they were there

14  at the time any shipment of drugs came in to collect the money,

15  after which they would leave and Mr. Lloyd might repair back to

16  Atlanta until the next shipment was coming in.

17    THE COURT:  There's no specific reference, though, in

18  a transcript, to Mr. Lloyd and this money?  I'm asking.

19    MS. EVERHART:  No, Your Honor.

20    THE COURT:  I'm going to treat this the same as I did

21  this last objection.  I just don't think that lack of

22  specificity in that context with various conspirators rises to

23  the preponderance level.  So I'm going to overrule that

24  objection.

25    Then we come to seven kilos of the bad cocaine that

64

1  was brought to Barkleaf by Mr. Wheeler.

2         MS. EVERHART:  Yes.

3         THE COURT:  Okay.  And you've cited Pages 333 to 336

4  of the transcript in support of that argument.

5         MS. EVERHART:  And also Pages 302 through 304.

6         THE COURT:  All right.  Go ahead.

7         MS. EVERHART:  Your Honor, this was a much-discussed

8  incident between these people, including between Lloyd and

9  Black.  There was a recording that was introduced from May 21st,

10 2009 involving the discussion of this because it was such a low

11 quality weed.  In fact, Mr. Watson tried to bring out at trial

12 or tried to convince people at trial that this, in fact, wasn't

13 really cocaine, that it was some kind of fake cocaine or

14 something like that, but finally it had to be flushed down the

15 toilet, it was disposed of in that way.  But if you look at this

16 transcript you can clearly see that not only was, was Mister --

17 was it reasonably foreseeable to Mr. Lloyd, but since he was

18 discussing the incident with Black, he did know about this

19 shipment.

20        THE COURT:  Weren't they -- don't I recall that they

21 were actually selling it at a discount?

22        MS. EVERHART:  They were trying to, Your Honor.  And

23 they couldn't get anybody that was all that interested in buying

24 it.  So in the end, Black flushed it.

25        THE COURT:  Okay.  Anything else on that one?

1          MS. EVERHART:  No, sir.

2          THE COURT:  All right.  Mr. Watson?

3          MR. WATSON:  Judge, if I could just have a minute?

4   I'm reviewing the transcript.

5          THE COURT:  Okay.

6          (Pause in the record.)

7          MR. WATSON:  In reviewing the transcript, I don't see

8   anything specific to Mr. Lloyd.  So I would submit to the court

9   this is no different from the previous two drug amounts.  While

10  there may have been specific testimony of the seven kilograms of

11  cocaine, there's nothing specific to Mr. Lloyd about it.  If Ms.

12  Everhart can point me to a specific reference I certainly would

13  address it.

14         THE COURT:  All right.

15         MS. EVERHART:  This is starting at Page 302, he's

16  talking about bringing in the -- this is Black testifying,

17  bringing in seven kilos of cocaine, and goes on to talk about

18  meeting Wheeler off of 395 and giving the cocaine to Wheeler to

19  bring to Barkleaf, which is where he ended up.  And then on

20  Page 304 down at Line 17 it says "It was no good," making

21  reference to the cocaine, "and so Daugherty took it back and the

22  rest of it washed down the sink.  It wasn't actually cocaine.

23         "Okay.  Just not good quality?

24         "Answer:  Right.  It was not good quality cocaine or

25  what people want."

1          And then starting at Page 333, this is when we were

2    playing some of the tapes.  And this was conversation between

3    Black and Mr. Lloyd, and at Line 12 on Page 334 it says "Okay.

4    Mr. Black, what are the two of you discussing in that call?"

5    Which is referring to him and Mr. Lloyd.

6          "Answer:  We was talking about the previous

7    conversation when Rabbi wanted to hire a girl to move the

8    marihuana.

9          "Question:  And at one point Mr. Lloyd says, 'yo they

10   want to do it, but here's what it is, yo, I'm talking to him,

11   but I can't even talk to him too tough because I'm amongst one

12   of his soldiers."

13         Oh, here we go.  On Page 336 he's talking about the

14   Barkleaf house, and then the question:  "And what were these,

15   'he basically ate everything, my little two things out of it'?

16         "Answer:  I was telling him that we clean it out,

17   clean out everything that was in it, referring to Barkleaf, and

18   the two pie-pies was in regard to the blank.  So that was the

19   fake, the not-so-good cocaine that was left in the house.  I was

20   telling him I cleaned it all out of the house.

21         "Question:  Is this the same cocaine you ended up

22   flushing down the toilet?

23         "Answer:  Yes, ma'am.

24         "Question.  Lloyd says at one point he wants, he wants

25   me to do his dirty work."  And I guess that's the end of the

1  reference to that.  But they are clearly discussing that

2  seven kilos of cocaine that was very low quality.

3          THE COURT:  And which exhibit?  Is this 8, Government

4  Exhibit 8A?

5          MS. EVERHART:  Let's see.

6          THE COURT:  Madam Clerk, do you have 8A?

7          COURTROOM DEPUTY:  Yes, sir.

8          THE COURT:  Is it here?

9          COURTROOM DEPUTY:  Yes, sir.

10          MS. EVERHART:  Yes.  Exhibit 8A which would be the

11  tape, and probably 8B is the transcript.

12          THE COURT:  Do you have it there?

13          MS. EVERHART:  Yes, Your Honor.

14          MR. WATSON:  Yes, sir.

15          THE COURT:  Okay.  While you all are looking at that

16  let me make a proposal to you.  It's ten after 1:00 right now.

17  I have a 2:30, and we still have a fair amount to go through.

18  Perhaps we should get together, take our break, let you all

19  talk, have a chance to look at your transcript references,

20  things of that nature, and then come back at 3:00 and finish up.

21          MS. EVERHART:  Your Honor, I have someplace I have to

22  be at three o'clock.

23          THE COURT:  Well, can you change it?

24          MS. EVERHART:  I can try.

25          THE COURT:  What do you -- it'll take us to 2:30 to

68

1   finish the objections, the remaining objections, go through the

2   transcript and then for me to conduct the sentencing.

3              MS. EVERHART:  I will try to reschedule, Your Honor.

4   When I saw that you had a 2:30 sentencing I thought probably

5   we'd be finished by 2:30.  So...

6              THE COURT:  I did too.  But I think we've been working

7   through them expeditiously, but there's a lot.  And we have a

8   trial transcript.  And that's, it's an unusual sentencing --

9              MS. EVERHART:  Yes, sir.

10             THE COURT:  -- because of that.  So --

11             MR. WATSON:  Judge, I have one issue I'd like to raise

12  to the court before we take a break?

13             THE COURT:  Uh-huh.

14             MR. WATSON:  And that is, in all these objections, one

15  of them apparently I believe got lost in the shuffle when you

16  were identifying the remaining objections after the drug weights

17  that we had to address.  I did object to the manager

18  enhancement.

19             THE COURT:  Okay.  So why don't we take that up when

20  we come back.  And let's finish this one if you all are able to

21  you now, we'll take our break and then come back and start with

22  the manager enhancement.  And make sure that you remind me that

23  we need to take that up again.  So we're going to finish on

24  this.  You all are going to keep looking at this transcript?

25  Okay.  Go ahead.

1           And Ms. Everhart, do we need your agent?  Does he have

2  to stay for all this?  There's got to be something more

3  productive --

4           MS. EVERHART:  I think I'm going to excuse him for the

5  later session, Your Honor.  I thought that his testimony might

6  be needed, but...

7           THE COURT:  Can he go right now, or do you want to

8  talk to him?

9           MS. EVERHART:  No, I think he can.

10          THE COURT:  All right.  You are free to leave.

11          MS. EVERHART:  Your Honor, if we're going to have to

12  come back anyway, it might, I'm not even positive that this is

13  the correct transcript I'm looking at, but by three o'clock I

14  ought to have it.

15          THE COURT:  Very good.  We'll be back at

16  three o'clock.

17          (Recess taken from 1:13 p.m. to 3:55 p.m.)

18          THE COURT:  All right, Ms. Everhart.

19          MS. EVERHART:  Yes, sir.

20          THE COURT:  We were still talking about the 4,000?

21          MS. EVERHART:  I think it's seven kilograms.

22          THE COURT:  Seven.  I'm sorry.  Thank you.

23          MS. EVERHART:  I'd prefer it was 4,000 but --

24          Anyway, I found what was looking for.  It was

25  Government Exhibit 8B, is the transcript on Page 5.  And the

1  transcript starting at Page 333 where I was asking him to

2  translate.

3          THE COURT:  At Page 2 -- or what of 13?

4          MS. EVERHART:  Page 5, Your Honor.

5          THE COURT:  Page 5.  Okay.  Got it.

6          MS. EVERHART:  And if you look at, it goes Lloyd,

7  Black, Lloyd, Black, and then that second part where Black

8  speaks, he says, "Yo, but I've been telling you that, man,

9  because, yo, I'm about to tell the youth here now that he should

10 [stutters], come and do what he needs to do, you know, because

11 he basically ate everything, my two things, my little two things

12 out of it.  The little pie-pies that I have in here, I took them

13 out, you know, so I told the man, yo, the people aren't

14 responding, you know.  So you know."

15          And I asked him to translate, and that's beginning at

16 the bottom of Page 335.

17          THE COURT:  All right.

18          MS. EVERHART:  Line 23.  And the question is:  "Then

19 you say I'm about to tell the youth here that he should come and

20 do what he needs to do, you know, because he basically ate my

21 two little things out of it, the little pie-pie I have in here.

22          "What are you talking about?

23          "Answer:  I was talking about the Barkleaf house.  I

24 didn't get no money to pay the rent, to give to Shawn Brown to

25 pay the rent.  So I was telling him that I was going to tell

1  Shawn Brown you can take the house back.

2       "Question:  And what were these, 'he basically ate

3  everything, my little two things out of it?

4       "Answer:  I was telling him that we cleaned it out,

5  cleaned out everything that was in it, and the two pie-pies was

6  regards to the blank.  So that was the fake, the not-so-good

7  cocaine that was left in the house.  I was telling him that I

8  cleaned it all out of the house.

9       "Question:  Is this the same cocaine you ended up

10  flushing down the toilet?

11       "Answer:  Yes, ma'am."

12       THE COURT:  Okay.  So Mr. Watson, your response to

13  that?

14       MR. WATSON:  The fact that Clive back told Mr. Lloyd

15  what had happened -- and I think he was telling him what had

16  happened as opposed to what will happen -- to that cocaine, in

17  and of itself doesn't really mean much of anything with regard

18  to Mr. Lloyd's involvement with it.  I would submit that the

19  telephone call and Mr. Black's explanation of the telephone call

20  simply provides the court with the fact that Mr. Black told

21  Mr. Lloyd what he had done, without any particulars of

22  Mr. Lloyd's involvement with this cocaine.

23       THE COURT:  Why would he have told it to him

24  otherwise?  I mean, we're dealing with context here.  And Mr.

25  Watson, I'm not unsympathetic to the battle that you're waging;

1  that you have sort of an uphill battle on some of these issues

2  because of the context, but we can't completely take it out of

3  the whole trial context.

4         MR. WATSON:  Yes, sir, I understand.  I would just

5  point out then that it's obviously the government's burden by a

6  preponderance of the evidence, but their burden nonetheless, of,

7  you know, Mr. Black could certainly have testified more

8  precisely as to the origin of the cocaine or Mr. Lloyd's

9  involvement with it, certainly could have come here today and

10 testified.  But simply relying on the fact that Mr. Black just

11 told Mr. Lloyd that it had been disposed, even with the

12 context -- and I certainly understand the court's point that

13 it's not like this conversation can be taken and just examined

14 without looking at everything else that has been testified to in

15 this case -- but would still take the position that just telling

16 Mr. Lloyd that it had been deposed of or flushed down the drain

17 isn't enough to attribute these seven kilograms to him.

18        THE COURT:  I don't know.  I think -- again, it's a

19 preponderance of the evidence standard.  I think the government

20 has met that burden on this based upon the -- I just don't, I

21 don't see him, why he's giving him this information other than

22 because of Lloyd's involvement with it.  So I'm going to sustain

23 that objection and the seven kilos will be included.

24        Now we come to 9 to 10 kilos of cocaine and thousands

25 of pounds of marihuana based on Todd's testimony of what he saw

1   at Barkleaf in 2008.  Mr. Todd had been testifying that he lived

2   at Barkleaf for about a month, and then states that he never saw

3   Sammy at the house during this time; he did meet him on one

4   occasion outside of Barkleaf and a marihuana deal was discussed.

5           And then at Page 553 of the transcript it talks about

6   thousands of pounds of marihuana on one occasion, 1,000 pounds,

7   but then states 9 or 10 kilos without specifying which drug.

8   And apparently the government is arguing that this is cocaine,

9   and the witness did previously mention cocaine.  So we're

10  looking, I guess, at Page 553; is that right?

11          MS. EVERHART:  I believe that's so, Your Honor.  Those

12  were the pages that I had cited.

13          THE COURT:  Okay.

14          MS. EVERHART:  And I would say that throughout this

15  trial when reference was made to kilos, they were always talking

16  about cocaine; when reference was made to pounds, they were

17  always talking about marihuana, which is typical for this group.

18  Because I had asked him, this is 553 at Line 9, "Now, what sort

19  of quantities of drugs were being stored at Barkleaf during the

20  times you were there?

21          "Answer:  Thousands of pounds of marihuana, like on

22  the one occasion was 1,500 pounds of marihuana, and about nine

23  or 10 kilos."

24          So we've only got two drugs.  He's saying this much

25  marihuana and this much cocaine.

74

1          THE COURT:  But again, come back to this issue of

2    tying it to this defendant that we've discussed before and the

3    basis for me finding not a preponderance.

4          So then he goes on, "And this was at Barkleaf?

5          "Yes."

6          Where was it kept?

7          "In the attic of the house, the marihuana, and in the

8    laundry room."

9          "[What] part was Sammy playing in this?

10          "From my knowledge, Sammy was a person that

11   distributed the marihuana.

12          "And did you know him to make trips out of the

13   Tidewater area?

14          "Well, I know on one occasion.

15          "Tell us about that."

16          So we have a tie to him on the marihuana there?

17          MS. EVERHART:  What I would say, Your Honor, is that

18   you have to, if you recall, Andre Todd was staying at Barkleaf

19   and was in a position to see stuff, but when Mr. Lloyd came into

20   town, he was supposed to leave because Black was letting him

21   stay there and wasn't really supposed to be doing so --

22          THE COURT:  Right.

23          MS. EVERHART:  -- and therefore he would not have had

24   that much contact with Lloyd.  And it is the testimony of other

25   witnesses that connects Lloyd to the cocaine so far as many

75

1   different events for which he has been attributed quantities of

2   cocaine.

3         THE COURT:   Well, on this particular batch I will

4   allow the 1,500 pounds of marihuana, but I'm not going to allow

5   the cocaine to be included.   Or at least that's my inclination.

6   But I haven't heard from Mr. Watson yet --

7         MS. EVERHART:   Yes, sir.

8         THE COURT:   -- so I'd better hear from him.

9   Mr. Watson?

10        MR. WATSON:   We do have a different problem here than

11  with the other drug quantities, and that is, there is no

12  identification of a transaction or a date, such that I think

13  there's considerable danger here that we may have some double

14  counting between this amount of marihuana and some other amount

15  that's been attributed to Mr. Lloyd.   I mean, we have some other

16  large shipments that certainly have been attributed to him, and

17  this testimony on Page 553 certainly doesn't pinpoint any

18  particular date or shipment or different shipment than some

19  other of the amounts that have a been attributed to Mr. Lloyd.

20        THE COURT:   So you're concerned about double counting?

21        MR. WATSON:   Yes, sir.   That's my first concern.   But

22  I just don't think we have any context here to determine what

23  1,500 pounds or what weight at all that, you know, where it came

24  from, when it came there, and was it part of any other of the

25  marihuana that's been attributed to Mr. Lloyd already.

1          THE COURT:  When was he living at the house?

2          MS. EVERHART:  Your Honor, that started off in

3 November of 2008.

4          THE COURT:  So do we know, do we have testimony on the

5 end date?

6          MS. EVERHART:  I don't know that we have testimony on

7 the end date, Your Honor.  We do know that he was not living

8 there before November of 2008, and that 1,700-pound shipment had

9 been disposed of by then, because that was in July of 2008, and

10 they had -- well, first of all, Virginia Beach Police Department

11 got quite a bit of it, and according to the testimony of the

12 witnesses, it was not a very good quality marihuana and they

13 were shipping it out.

14          THE COURT:  Mr. Watson, let Ms. Everhart step up to

15 the podium and discuss this double counting issue a little

16 further.

17          It's your burden by a preponderance to show there is

18 no double counting issue, and we don't have a lot here.  Maybe

19 you think it's enough.  So if you do, you tell me.

20          MS. EVERHART:  Oh, I do, Your Honor, or I wouldn't

21 have put it in there.  And in fact I think it was brought out on

22 Mr. Dunn's cross that he was not there in the summer of 2008

23 because he was in jail.  And that, so this was -- that's where

24 the November 2008 date comes from.  And I do not have specifics

25 in the testimony, I'm just recalling the general testimony that

1   what we know is that the marihuana was brought, in the

2   1,700 pounds, in July of 2008.  The Virginia Beach Police

3   Department got their hands on a couple of hundred pounds of it

4   and the rest of it was, had been distributed by various people.

5   And a lot of it, according to the witnesses, was shipped out

6   because they were having problems unloading it here because of

7   the poor quality of the cocaine -- of the marihuana, rather.

8           THE COURT:  Do we have any other a contribution of

9   marihuana to Mr. Lloyd?

10          PROBATION OFFICER SULLIVAN:  No, Your Honor.  And

11  Mr. Lloyd is not mentioned again until February 24th of 2009,

12  and that's dealing with a cocaine shipment.

13          THE COURT:  Okay.  You know, the other was -- the

14  1,700 pounds was in July of 2008.  And this was?

15          MS. EVERHART:  After November Your Honor.

16          THE COURT:  November.  And I'm sorry, but refresh me

17  on how we know it was after November.

18          MS. EVERHART:  Apparently Mr. Todd was in jail until

19  late September and didn't hook up with Black until November.

20          THE COURT:  To have a place to live?

21          MS. EVERHART:  Exactly.  Because his wife kicked him

22  out of the house.

23          THE COURT:  But we don't know how much of the 1,700

24  pounds was taken by the police right off the top, do we?

25          MS. EVERHART:  Well, they took -- out of the storage

1  shed in Virginia Beach they took 200 kilos.  Then at the other

2  side --

3            THE COURT:  Two hundred --

4            MS. EVERHART:  Excuse me, 200 pounds, which is a

5  little under 100 kilos.

6            THE COURT:  Of marihuana.

7            MS. EVERHART:  And of the rest of it, some of it was

8  still in the other storage facility over in Norfolk, and that

9  was removed, but it did not go to Barkleaf, that marihuana went

10 to one of the other co-conspirators' house.  I don't think it

11 was Mr. Todd.  I think it was Mr. Lewis Scott.  They brought it

12 over there.  And the rest of it, according to the, because it

13 was of such poor quality -- I'm trying to recall which witness

14 said they were packing it up in tow trucks, like these trucks

15 that actually move vehicles up on top of them, packing those

16 vehicles and sending it out of the area.

17            And then there were a couple of people who were --

18 well, at least one, Angela Thomas, who was arrested with

19 30 pounds of marihuana that perhaps came out of that shipment, I

20 don't know.  But the rest of it had been -- what couldn't be

21 disposed of locally was sent to their other distribution

22 locations.

23            THE COURT:  You know, July, November, is it likely

24 that the rest of the 1,700 was all gone?

25            MS. EVERHART:  I would say yes.

```
 1              THE COURT:  Yes?  Yes, I agree it's likely.  But you
 2    know, have you met the burden of proof by a preponderance on
 3    this issue?  It's close.  I think, because it is close, I'm not
 4    going to include it.  So the objection is overruled and it will
 5    not be included.
 6              Then we have the hundred pounds of marihuana based on
 7    cash found in Mr. Lloyd's suitcase in Phoenix, right?
 8              MS. EVERHART:  Yes, sir.
 9              THE COURT:  And that is an issue of whether or not
10    there's enough evidence to convert that money to marihuana.  And
11    we have Page 345 and 346 references to what Mr. Lloyd told
12    Mr. Black.
13              This is Mr. Black testifying.  Question at 345, Line
14    24, "Now sometime right in this time frame, about the beginning
15    of June, middle of June, 2009, did Mr. Lloyd tell you about
16    losing some money?
17              "Answer:  Yes, ma'am.
18              "Question:  What did he tell you?
19              "Answer:  He told me that they took $100,000 from him,
20    I think in Arizona, from off the plane or something.
21              "Question:  Did he tell you whose money it was?
22              "Answer:  The big buy from Baltimore.
23              "Question:  Did he tell you why he was in Arizona?
24              "Answer:  No, ma'am."
25              Okay.  Is there anything else on that?
```

```
 1              MS. EVERHART:  Well, I think we can judge this from
 2  the context, Your Honor, because it was during the same period
 3  of time that he was trying to negotiate with first an informant
 4  and then later the ICE agent, and that would have been
 5  Mr. Heyward, and talking about bringing large amounts of
 6  marihuana in.  And this is all sort of one thing follows
 7  another.  And then he's flying into Arizona, which is the source
 8  state for marihuana, with $100,000, which is why I think it
 9  should be looked at in marihuana terms as opposed to cocaine
10  terms.  Because what Mr. Lloyd was very heavily involved with
11  during that same time frame was trying to arrange the transport
12  of large sums of -- large quantities, rather, of marihuana.
13              THE COURT:  He was encountered as he was arriving?
14              MS. EVERHART:  Yes.
15              THE COURT:  Mr. Watson?
16              MR. WATSON:  My recollection was that Mr. Lloyd was
17  encountered in the airport at the baggage claim area and was
18  intercepted somewhere close to the baggage claim area.
19  Certainly would agree that --
20              THE COURT:  That's not inconsistent with what Ms.
21  Everhart said, is it, about him arriving?
22              MR. WATSON:  No, sir, it is not.
23              THE COURT:  Okay.
24              MR. WATSON:  Would have to admit there are not too
25  many good explanations for having a large amount of cash in your
```

81

```
 1   duffel bag.
 2           THE COURT:  And it was in a secret -- was it in a
 3   secret compartment, as I recall?
 4           MS. EVERHART:  It was sewn into the lining of the
 5   suitcase.
 6           THE COURT:  I call that a secret compartment.
 7           MS. EVERHART:  Yes, sir.
 8           MR. WATSON:  Not many great explanations for why he
 9   had the cash in the airport in that manner, but on the other
10   hand, it is the government's burden to prove that this was part
11   of a drug deal.  And we don't have anything more or less than
12   him getting stopped in the airport and -- well, certainly have
13   to mention that he mentioned it to Clive Black also.  But that's
14   pretty much the beginning and the end of it.  He gets the cash
15   taken out of the duffel bag and he mentioned it to Clive Black.
16   But there's really no indication whatsoever that he was going to
17   purchase marihuana or that he had, or this was the proceeds from
18   a marihuana purchase.
19           Now, because there aren't many other good explanations
20   for why he had that money or what legally he was doing with that
21   money, I mean, certainly hard to imagine other things that
22   didn't involve drugs he could have been doing with the money.
23           THE COURT:  He arrived at the airport in Arizona with
24   money that belonged to the big guy from Baltimore, it was sewn
25   into the suitcase, and they were trying to arrange, there were
```

82

1    discussions of them trying to arrange a deal through Arizona.

2    We have all that before us, I think.  And your suggestion is

3    that it doesn't tie it enough?  Tie it together enough?

4              MR. WATSON:  I would have to agree with all of that

5    except for I'm not certain there were any discussions about a

6    drug deal being arranged in Arizona.

7              THE COURT:  Well, okay.  I don't want to get my

8    evidence mixed up, so I better hear from Ms. Everhart.

9              MS. EVERHART:  The ice agent was in Arizona.

10             THE COURT:  Right.  He was the one that was having the

11   telephone conversations about being the transporter, wasn't he,

12   Mr. Watson?

13             MR. WATSON:  I --

14             THE COURT:  That was my recollection from the trial.

15             MR. WATSON:  It -- that is my recollection, that the

16   ice agent was in Arizona.  I'm not sure that discussions were

17   about a drug transaction in Arizona, but I --

18             THE COURT:  Okay.

19             MR. WATSON:  Not to put too fine a point on it, but I

20   don't recall one way or the other.  I don't specifically recall

21   there being any discussions about transporting drugs from

22   Arizona.  That's all I can say.

23             THE COURT:  Ms. Everhart, refresh me on the Arizona

24   connection.

25             MS. EVERHART:  Your Honor, Mr. Heyward, after he had

83

1   been negotiating with the defendant, then gave the defendant the

2   means to contact the ICE agent out in Arizona, who of course was

3   acting undercover, and at that point they began discussing a

4   4,000-pound deal there.  And the ICE agent was in Arizona, and

5   that was known to the defendant.

6          THE COURT:  So we don't have any further testimony

7   from ICE about the -- and you're not suggesting this money was

8   in furtherance of that particular deal?

9          MS. EVERHART:  Well, that actually occurred

10  beforehand.  But I think it was the general scheme of these

11  people.  And there was mention in one of the transcripts of AZ,

12  which is Arizona.

13         THE COURT:  So your theory is that somebody else in

14  Arizona was going to be providing, not the ICE agent?

15         MS. EVERHART:  Oh, yes.  This person named D.  And it

16  looks to me like Mr. Lloyd was being sort of the middle-man in

17  this deal that he was trying to negotiate with the agent in

18  Arizona, and it was probably the same sort of deal that he

19  expected to get a little kickback out of the transportation fee.

20         In any event --

21         THE COURT:  Where is the reference to D in Arizona?

22         MS. EVERHART:  There are some conversations that the

23  ICE agent had with D that were actually played at trial as well.

24         THE COURT:  Do you want to point me to something more?

25         MS. EVERHART:  Okay.  But Your Honor, I do think that

Paul L. McManus, RMR, FCRR Official Court Reporter

1   the bottom line is there's no explanation for that.  What

2   Mr. Lloyd was doing during that period of time was trying

3   desperately to arrange transport of marihuana, and he comes to a

4   source state.  He had not yet at that point been introduced to

5   the agent in Arizona.  That happened later.

6              THE COURT:  Well, you know, Ms. Everhart, even if

7   there was a reference to D, it's -- it's not going to -- I don't

8   think it's going to take me to a preponderance position on this

9   issue, so I'm going to overrule the objection on that.

10             MS. EVERHART:  Yes, sir.

11             THE COURT:  Okay.  Now you have -- don't go anywhere,

12  because we've got -- I think this is your last one -- well, no,

13  we've dealt with that.  We've dealt with the 20 versus the 30.

14             Did you have anything else?

15             MS. EVERHART:  No, Your Honor.

16             THE COURT:  Okay.  So now we have the role enhancement

17  issue that -- and then the gun.  Those are the two remain

18  issues, right?

19             MS. EVERHART:  Yes, sir.

20             THE COURT:  Okay.  Mr. Watson?

21             MR. WATSON:  Would you like me to address the manager

22  first?

23             THE COURT:  Role enhancement.  Hmm-hmm.

24             MR. WATSON:  Yes, sir.  Dealt with Section 3B1.1(b),

25  which is the three-level enhancement and the defendant was

1   manager or supervisor and the criminal activity involved five or

2   more participants.  I would have to agree on the second part of

3   the test, five or more participants, obviously.  So the only

4   issue is whether Mr. Lloyd was a manager or supervisor.  The

5   test is whether he basically controlled the activities of

6   others.  And --

7           THE COURT:  Leadership over only one participant is

8   enough, according to the case law, right?

9           MR. WATSON:  I would agree that controlling the

10  activities of just one person is enough under the case law.

11          THE COURT:  Okay.

12          MR. WATSON:  And would submit that in this case,

13  Mr. Lloyd, the evidence was, assisted in the acquisition of

14  marihuana, was basically a middle-man.  I guess would have to

15  admit the evidence had a couple different roles for him, but

16  primarily his role was as a middle-man for Clive Black and

17  others for acquisition of marihuana from the southwest to the

18  mid-Atlantic, the basics of the testimony against Mr. Lloyd.

19  And I would characterize him as somebody who was paid, allegedly

20  was paid for setting up these transactions.  I would submit to

21  the court that Clive Black was clearly at least a leader, was

22  probably the leader of this local organization that Mr. Lloyd,

23  certainly it was testified to, participated in.

24          THE COURT:  Paragraph 46 bases it on direction of

25  activities of CW-15, right?  That's what the probation officer

1   relied upon for giving the enhancement.

2          MR. WATSON:  Yes, sir.  I have Paragraph 46 in front

3   of me now.

4          THE COURT:  Okay.

5          MR. WATSON:  And I would agree with that, that my

6   understanding from Paragraph 46 is that this was -- I'm not

7   completely certain -- but Trenton Hawkins, who was driving at

8   least on one occasion the marihuana between -- well, I believe

9   the 1,700 pound shipment.  But I just want to be sure before I

10  proceed.

11         THE COURT:  Maybe we should hear from the government

12  on this issue.

13         MS. EVERHART:  Your Honor, CW No. 15 is Mr. Heyward.

14  But there was certainly plenty of evidence -- was it?

15         PROBATION OFFICER SULLIVAN:  No, Your Honor.

16         MS. EVERHART:  Okay.  Who is it?

17         PROBATION OFFICER SULLIVAN:  All we have is a

18  cooperating defendant.  We didn't have any more information

19  about it.  It was a CI that was working with ICE.

20         MS. EVERHART:  Well, I guess if Probation can't answer

21  it, then I don't know who CW-15 is.  But certainly I can tell

22  the court that Mr. Lloyd directed the activities of more than

23  one individual.  He directed the activities of Black.  Black

24  clearly worked for him.  He recruited Hawkins.  He attempted to

25  recruit Heyward.  He tried to recruit an ICE undercover.  He

1  certainly was the architect of that 1,700 pound deal, from the

2  testimony of all of the witnesses.  When the load came back to

3  this area, he told Black to round up some people to unload all

4  the stuff, which he did.

5          THE COURT:  Okay.  Give me some, give me some

6  references.  Try to pick your best ones.  It only takes one,

7  according to the case law and the guidelines.

8          MS. EVERHART:  Take the matter with Mr. Hawkins, and I

9  don't know that I can direct you to any particular page number,

10 but Lloyd asked Black to find him a driver to bring this stuff

11 up, and he found Hawkins.  And thereafter, Lloyd talked to

12 Hawkins and hired Hawkins to get a driver because Hawkins had

13 lost his license, I think, at that time, to drive the marihuana

14 from Texas back here.  And he, Lloyd, followed in another

15 vehicle, the truck going down to Texas and coming back.  And

16 then he, according to any number of witnesses, was in charge of

17 the unloading of that vehicle.  He certainly controlled Black.

18 Black arranged for the house at Barkleaf at the request of

19 Lloyd.  Black rented the storage sheds at the request of Lloyd

20 to store the marihuana.  Lloyd was collecting money which he was

21 then turning over to Mr. Lloyd or Mr. Wheeler, who happened to

22 be at the house at the time, from the proceeds of the sales.

23 And Lloyd was also basically in charge of arranging many if not

24 most of these drug deals.

25          THE COURT:  What do you say to Mr. Watson's argument

1  that these were merely co-conspirators working together?

2           MS. EVERHART:  One of the elements that one looks at

3  in deciding whether or not somebody is in a supervisor position

4  is whether or not they recruited other people.  Black was doing

5  what Lloyd told him to do, not the other way around.  He may

6  have -- well, he was operating at a lower level doing

7  distribution on his own, clearly, but it was Mr. Lloyd who was

8  recruiting all these drivers, or attempting to recruit drivers

9  to bring these loads in from Texas, which indicates to me that

10 he was exercising a supervisor or managerial role.

11          THE COURT:  When we get to the point where Mr. Lloyd

12 is here with the, I forget what they were called at the trial of

13 these other guys, the gun incident, where the gun is given to

14 the agents, in that incident Mr. Black -- was Mr. Black driving

15 Mr. Lloyd around --

16          MS. EVERHART:  Yes.

17          THE COURT:  -- when those gentlemen came here?

18          And they switched off vehicles at some point, didn't

19 they?

20          MS. EVERHART:  They did.  And Lloyd was at that point

21 being recruited by -- Mr. Lloyd and his friend Black was being

22 recruited to drive them around and try to find this person who

23 owed them money, and there were, of course, frantic

24 communications between Lloyd and the ICE agents because they

25 were concerned that somebody was going to get hurt with Lloyd

89

1  and his buddies running around with guns trying to collect a

2  drug debt.

3         THE COURT:  So you wish to -- all right.  I have a

4  role in the enhancement, role in the offense enhancement based

5  upon CW-15.  We don't know enough, I take it, at this point for

6  you to sort of defend that assertion with respect to CW-15.  And

7  so your assertion is the enhancement does apply but for

8  different reasons?

9         MS. EVERHART:  Yes, sir.  There was nothing that I

10 would object to because I thought he deserved at least a three

11 if not a four-point role enhancement.

12        THE COURT:  This is a 3?

13        MS. EVERHART:  This is a 3.  And the basis for it from

14 Probation's point of view, I having been more familiar with the

15 case and sat through the trial testimony, there was all sorts of

16 evidence of his managerial and supervisory position in this

17 matter.

18        THE COURT:  So in essence you want me to sustain the

19 objection with respect to CW-15, but not with respect to the

20 other --

21        MS. EVERHART:  No, Your Honor.  I believe CW-15 was

22 Heyward, and he was certainly attempting to recruit Mr. Heyward.

23 But I'd have to go back and take a look at who CW-15 is from the

24 context of the presentence report.

25        THE COURT:  I guess what I'm getting at, Ms. Everhart,

1   is the defendant walked in here thinking he was defending, he

2   was looking at that as the basis for the enhancement.

3           MS. EVERHART:  Well, I will say that in his final

4   position paper he didn't even mention role, or I might have had

5   more of that in my position paper.  He had initially talked

6   about role.  I think it was an oversight on Mr. Watson's part.

7   But be that as it may.  I had abandoned, I think, at least one

8   or two of his other objections and I didn't know if he was going

9   forward with that.

10          THE COURT:  I think for me -- let me say this:  For

11  me, my sense, I certainly had a very, a real sense that, at the

12  end of that trial, that Mr. Black was doing the bidding of

13  Mr. Lloyd.  And perhaps others, but also of Mr. Lloyd.  That's,

14  to me, the real question here about the role in the enhancement,

15  notwithstanding that it's CW-15 on which it's based here.

16          So Mr. Watson, I think maybe you need to try to

17  address that for me.  Because when we look at -- the three-level

18  enhancement is appropriate if the defendant is a manager or

19  supervisor, not an organizer or leader, and the criminal

20  activity involved five or more participants.  As you said, it

21  did involve five or more.  So we're dealing with whether he's a

22  manager or supervisor.  And he has to have been the manager or

23  supervisor of at least one or more participants.  And the

24  government has sort of broadly asserted multiple people, but I'm

25  going to focus on Black for the moment and leave out Hawkins and

1    Heyward, and look at how Black fits in.

2           In this Rashawn case, 328 F.3d 160, the Fourth Circuit

3    said "In determining whether a sentencing enhancement is

4    appropriate here, a district court should consider whether the

5    defendant exercised decision-making authority for the venture."

6           Well, no question in my mind, based upon everything

7    that I've seen, that Mr. Lloyd exercised a significant amount of

8    decision-making authority trying to set up all these deals.

9           "Two, whether he recruited others to participate in

10   the crime."  And he came here and found Mr. Black and had gotten

11   Mr. Black to find a house for him on Barkleaf Drive.

12          And then "Whether he took part in planning or

13   organizing the offense."  Clearly we've been talking about that

14   all throughout the day of his efforts to coordinate these varies

15   shipments.

16          And then "The degree of control and authority that he

17   exercised over others."  He's got to exercise authority over at

18   least one other person.  So we're looking at Mr. Black right

19   now.

20          Hold on a second.

21          (Pause in the record.)

22          THE COURT:  So Mr. Watson, that's where I am when I

23   look at this.  And I wanted to give you the opportunity to

24   address that.

25          MR. WATSON:  Yes, sir.  I don't have that particular

1  case in front of me, but I do have case law which identified

2  those four factors, as well as three others, being a claim to a

3  large amount of the proceeds, and then two general factors,

4  nature of participation and nature of the crime.  But I would, I

5  guess, first submit that I don't believe there's any evidence

6  that Mr. Lloyd had any larger or smaller share of the proceeds.

7  They -- than Mr. Black, for example.  As far as Mr. Black's

8  testimony as to whether he or Mr. Lloyd was either on top of

9  this pyramid or at least higher up than the other one, I would

10  submit that that would not be, that that would not be clear;

11  that I could certainly understand someone taking from his

12  testimony at certain points that he was not higher or at the

13  top, but at other points that he was; that he was the one kind

14  of commanding everyone here locally -- not to digress too far in

15  Mr. Black's particular role in all of this -- but that Mr. Lloyd

16  was more, as I said before, his middle-man to get the large

17  quantities as opposed to someone locally who organized anyone or

18  commanded anyone.  That Mr. Black had that role.  And while I

19  can understand thinking that the person who is bringing in or at

20  least facilitating the importation of large quantities of drugs

21  may be over the person locally who was then taking them and in

22  charge of distributing them out locally, I would submit to the

23  court that Mr. Lloyd was just Mr. Black's middle-man.  And I

24  certainly understand that Mr. Black testified as to Barkleaf

25  Drive and a few other things that Mr. Lloyd, that Mr. Lloyd

1  directed him to do or suggested that he do, but would suggest in

2  totality that neither one of then was reporting to the other.

3       THE COURT:  Okay.  Thank you.  I'm going to overrule

4  the objection to the role enhancement.  I also looked at this

5  Cameron case from 2009, 573 F.3d 179 that dries tries to

6  distinguish sales, or kind of analyze sales and the differences.

7  And when I look at the way they do that, I see a lot of those

8  elements here that were not present there that I just reviewed

9  with respect to Mr. Lloyd's involvement with Mr. Black and with

10 organizing the shipments and overseeing much of what was taking

11 place here.  Even if he only infrequently -- well, let me say it

12 differently.

13      Even if he was not here at the Barkleaf Drive house

14 constantly, I see enough presence and look at these various

15 indicia, enough indicia to confirm his control and direction of

16 activity over Mr. Black.  And so I'm going to overrule that

17 objection.

18      Then we get to the gun enhancement.  I think that's

19 where we are.  So the jury acquitted Mr. Lloyd of Count 28,

20 possession of a firearm in furtherance of drug trafficking.  And

21 the defendant, in the position statement, has highlighted the

22 fact; that the only person to place a gun in Mr. Lloyd's hand,

23 hands, was Mr. Black, at transcript Page 1031, and that in

24 finding the defendant not guilty of the weapons charge, the jury

25 rejected Mr. Black's testimony.

94

1         In Grubbs, this 2009 decision from the Fourth Circuit,

2    they said, "A sentencing court may consider uncharged and

3    acquitted conduct in determining a sentence, as long as that

4    conduct is proven by a preponderance of the evidence" -- they

5    cite Watts -- holding "A jury's verdict of acquittal does not

6    prevent the sentencing court from considering conduct underlying

7    the acquitted charge, so long as that conduct has been proven by

8    a preponderance of the evidence," and Jones, holding "that a

9    defendant need not be convicted of the charges constituting

10   relevant conduct for him still to be held accountable for them

11   when a sentencing court determines that the defendant's

12   sentence, as long as the government establishes the existence of

13   these other incidents by a preponderance of the evidence."

14        So the question is whether or not the government's

15   demonstrated by a preponderance of the evidence that Mr. Lloyd

16   possessed a firearm.

17        Let me maybe hear first from you, Ms. Everhart.

18        MS. EVERHART:   Your Honor, there are two incidents

19   upon which this could be based:   The first being the arrival of

20   Mr. Lloyd and this person named Black in the Norfolk area to

21   attempt to find Mario Woods and get the money out of him that he

22   owed Mr. Lloyd and his compatriot, and according to the

23   testimony that we reviewed earlier, he had a gun during that

24   incident.

25        There was extensive testimony about the second

Paul L. McManus, RMR, FCRR Official Court Reporter

1    incident beginning at about Page 1015 of the trial transcript.

2    Once again it was Mr. Lloyd and this time has Baltimore guys.

3    They were here looking for somebody, once again, that owed him a

4    drug debt, and they were running around town with guns.

5    According to the testimony of the local ICE agents, they were in

6    constant contact with Lloyd that day who was giving them sort of

7    a blow-by-blow of what was going on, and very eventually they

8    were getting so concerned, the ICE agents made their presence

9    known, at which point Lloyd panicked and gave the gun to Lloyd,

10   who immediately called the Virginia Beach Police Department and

11   ICE agents who came and retrieved the gun, and that was entered

12   into evidence.

13            In addition to the testimony of Black in this regard,

14   we also have all of the agents who did surveillance and saw

15   Black in the company of Mr. Lloyd and these Baltimore guys as

16   they drove around town.  And there was also testimony from the

17   agents that they spoke with the relative of the person who owed

18   the drug debt to try to see if they could get any more

19   information on that.

20            So we would submit in addition -- and importantly,

21   that the elements to prove 924(c) beyond a reasonable doubt

22   requires a lot more than the preponderance standard at this

23   stage of the game.  And also the elements of a, to prove a

24   924(c) are very different.  We're talking here about whether a

25   gun was present during the offense as opposed to whether a gun

1  was possessed and used in furtherance of a drug conspiracy.  The

2  jurors did not find that Mr. Lloyd didn't have a, gun.  They

3  found that he did not have a gun, in their opinion, in

4  furtherance of the drug conspiracy.  And because --

5          THE COURT:  Because it was the gun of the other guy

6  that was there?  That was what Black told -- excuse me, that was

7  what Mr. Lloyd told Mr. Black, according to Mr. Black, that it

8  wasn't Lloyd's gun, but it was the gun of the man that came with

9  him?

10         MS. EVERHART:  But in any --

11         THE COURT:  Came with Mr. Lloyd.

12         MS. EVERHART:  But Mr. Lloyd is the person who turned

13  the gun over to Mr. Black, according to Mr. Black's testimony.

14         THE COURT:  No, I understand that.  I'm just saying,

15  to try to make sense of what's happened here and why the jury

16  would have done what they did, you're saying they didn't

17  necessarily believe Mr. Lloyd possessed the gun in furtherance

18  of drug activity; he was taking the gun from someone else?

19         MS. EVERHART:  No, I think my -- my view of it is --

20  and of course you never know why a jury does what they do.  We

21  can speculate.  But I don't think that they found that Lloyd

22  didn't possess it or even that it wasn't his gun, but that it

23  wasn't being used in furtherance of the drug conspiracy.  This

24  was not a standard 924(c) where the gun is laying on the table

25  during the drug deal.  There was no drug deal occurring during

Paul L. McManus, RMR, FCRR Official Court Reporter

1  this event.  And my argument was that it was in furtherance of

2  the conspiracy in general, and they apparently did not buy that

3  argument.  Or that's my analysis of why they decided what they

4  decided.  But one never knows about these things.

5           THE COURT:  Okay.  So of the two instances, in the

6  first instance when Lloyd and Blacks arrived to look for

7  Mr. Woods, Lloyd had a gun there.  That was -- was that before

8  the jury?

9           MS. EVERHART:  Yes.  That was at Page 226.  I think we

10 looked at this earlier, Your Honor.

11          THE COURT:  Well, it's your case --

12          MS. EVERHART:  Yes, sir.

13          THE COURT:  -- and I'm sure you have it committed to

14 memory better than I do.

15          What is 226?

16          MS. EVERHART:  Well, I think that's a wrong, an

17 incorrect page reference.

18          THE COURT:  Ms. Sullivan, what paragraph is this

19 addressed?

20          MR. WATSON:  Judge, it was Paragraph 21 of the

21 presentence report.

22          THE COURT:  Okay.  Thank you.

23          And the actual enhancement?

24          PROBATION OFFICER SULLIVAN:  The actual enhancement is

25 in Paragraph 46.  As well as the worksheets, obviously.

1              MS. EVERHART:  Okay.  It's actually 266, Your Honor.

2              THE COURT:  All right.  Transcript, trial transcript

3    Page 266?

4              MS. EVERHART:  Yes, Your Honor.

5              THE COURT:  Okay.  This was the friction discussion.

6    I remember this.  So Mr. Black says "There was another party

7    involved in this whole scenario in Atlanta named Blacks.  They

8    came back to my house looking for Mario with guns and stuff

9    trying to find out where he lived at, because they wanted the

10   money.  Wanted me to take him to his house.

11             "Why didn't you want Mr. Lloyd and his friends to find

12   Mario Woods?

13             "I thought they would kill him.  And he had two

14   daughters.  So that's why."

15             All right.  Ms. Sullivan, was there, though, within

16   the language of our --

17             PROBATION OFFICER SULLIVAN:  It's in Paragraph 39,

18   Your Honor.

19             THE COURT:  Okay.

20             PROBATION OFFICER SULLIVAN:  The very, I would say

21   probably the last two sentences.  It's Page 15.

22             THE COURT:  Thank you.

23             All right.  Ms. Everhart, we have Paragraph 39 and we

24   have page 266.  Go ahead.

25             MS. EVERHART:  So Your Honor, clearly there was a gun

1    present during the conspiracy on both occasions, both with Mario

2    Woods and with this other individual; that they were attempting

3    to collect drug debts through the use of firearms, and if the

4    gun is present and it's not, clearly not unconnected to the drug

5    activity, then that firearm enhancement should be sustained.

6                THE COURT:  All right.  Mr. Watson, anything else?

7                MR. WATSON:  Both gun allegations were clearly

8    testified to as attempts to collect a drug debt.  So when the

9    jury found Mr. Lloyd not guilty of that count, unless there was

10   some nullification, they necessarily found that he didn't

11   possess the guns.

12               THE COURT:  By a preponderance of the evidence?

13               MR. WATSON:  Yes, sir.

14       -       THE COURT:  Excuse me.  Beyond a reasonable doubt.

15               MR. WATSON:  Yes, sir.

16               THE COURT:  Here we're at a preponderance of the

17   evidence.

18               MR. WATSON:  And that was certainly going to be my

19   next point, was, we know -- or I would submit, that Mr. Lloyd

20   did not possess a gun beyond a reasonable doubt.  That's, I

21   guess, the beginning and the end of what the jury told us.  And

22   realize today that we are not here under that standard, we are

23   here under a lesser standard of the preponderance of the

24   evidence.  The commentary says that the adjustment should be

25   applied if the weapon was present.  And we certainly have