IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                                                      )<br>)<br>SAMUEL LLOYD,                            )<br>)<br>Defendant.                       ) | Crim. No. 2:11CR36 |

**United States' Response in Opposition to Defendant's Motion for Appointment of Counsel,
Request for Compassionate Release, and Reduction of Sentence**

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney, and Elizabeth M. Yusi, Assistant United States Attorney, hereby responds in opposition to defendant SAMUEL LLOYD's motion for appointment of counsel, request for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on extraordinary and compelling reasons, and reduction of section pursuant to the First Step Act[1]. In support thereof, the government avers the following:

### I.        Factual and Procedural Background

From in or about fall 2004, and continuously thereafter up to and including June 20, 2011, SAMUEL LLOYD and conspirators engaged in a conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, 280 grams or more of cocaine base and 1,000 kilograms or more of marijuana.  ECF No. 233, PSR at ¶ 18.  The investigation that led to their identification when, in July 2008, ICE began investigating a major narcotics

---

[1] The Probation Office was not asked to determine whether defendant qualified for relief under the First Step Act.

1

trafficking organization involved in the smuggling and distribution of cocaine and marijuana into the United States from Mexico, with distribution hubs in Atlanta, Georgia; San Antonio, Texas; and the Hampton Roads area of Virginia. *Id.* at ¶ 19.

After trial, on September 14, 2011, a jury convicted the defendant, Samuel Lloyd of Counts 1, 5, 6, and 26 (Conspiracy to Distribute and Possess With Intent to Distribute 5 Kilograms or More of Cocaine and 1,000 Kilograms or More of Marijuana; Attempt to Possess with Intent to Distribute Approximately 1,500 Pounds of Marijuana; Aid and Abet the Possession with Intent to Distribute Approximately 1,700 Pounds of Marijuana; and Aid and Abet the Possession With Intent to Distribute Approximately 40 Pounds of Marijuana) of a Superseding Indictment. ECF No. 167, Verdict Form.

At sentencing, the defendant's guideline range was calculated using a base offense level of 36 (using the 2008 USSG) with a two-level increase for possession of a firearm, and a three-level increase for his role in the conspiracy. ECF 233, PSR; ECF No. 254, Statement of Reasons. The defendant's total offense level was 41, and his criminal history category was I (he had no criminal convictions). This yielded a guideline range of 324 to 405 months of imprisonment. On January 30, 2012, the defendant was sentenced to 360 months in prison.

Five years later, on April 10, 2017, the defendant moved for a sentence reduction based on a retroactive guidelines amendment, ECF No. 370, and the United States did not oppose, ECF No. 375. Applying Amendment 782, the defendant's new guidelines range was 262–327 months' imprisonment, calculated from a total offense level of 39 and criminal history category of I. ECF No. 374. This Court reduced the defendant's sentence from 360 months' to 290 months' imprisonment. ECF No. 376.

The defendant now seeks three things: 1) appointment of counsel, 2) compassionate release, and 3) a subsequent sentence reduction—this time under section 404 of the First Step Act. ECF No. 395; *see* Pub. L. No. 115-391.

## II. Motion for Appointment of Counsel

LLOYD requests the Court to appoint counsel for his pending motions. The government opposes this request. The Sixth Amendment right to counsel only applies to criminal proceedings. *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974). It does not apply to post-conviction relief; these proceedings are civil in nature. *Pennsylvania v. Finley*, 481 U.S. 551, 556-7; *United States v. Taylor*, 414 F.3d 528, 536-7 (4th Cir. 2005). The defendant successfully filed his letter motion, and no further legal guidance is necessary. Thus, his motion for counsel should be denied.

## III. Motion to Reduce Sentence Under 18 U.S.C. § 3582(C)(1)(A)(I) Based on Extraordinary and Compelling Reasons

18 U.S.C. § 3582 is a very narrowly tailored statute which only gives a Court discretion to reduce a term of imprisonment in a limited number of circumstances. None of those extraordinary or compelling circumstances are present so a reduction in sentence is unwarranted in this case. Accordingly, the Court should deny the defendant's motion.

The crux of the defendant's motion for resentencing under 18 U.S.C. § 3582(c)(1)(A)(i), based on extraordinary and compelling reasons includes the following: 1) he has no criminal history and is a non-violent offender 2) he has served over ½ of his sentence (which he has not), 3) he has taken responsibility, 4) he completed drug rehabilitation, 5) he has the support of his community and family if returned to society, 6) he has been diagnosed with an enlarged prostrate and COPD, and 7) he has lost four siblings while in prison and two others are sick.

Attached to the defendant's motion are a Male Pattern Risk Scoring, an Inmate Education Transcript, and Request for Administrative Remedy. ECF No. 395. While it is commendable that the defendant has seemingly made concerted efforts to take advantage of the rehabilitative opportunities available to him while incarcerated, the list of items that he provides do not appear so remarkable that they can be characterized as "extraordinary and compelling" to compel early release.

### A. Defendant's request for compassionate release should be evaluated against a practical and legal backdrop.

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided the "Bureau of Prisons" with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney

General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, up to now, BOP has placed an additional 4,360 inmates on home confinement (*see* https://www.bop.gov/coronavirus), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released. Inmates do not have to apply to be considered for home confinement.

BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

---

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for Covid-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by

the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to evaluate a range of quickly changing facts:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12. <u>New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.</u>

- *Protecting the public from infection.* Any release should include measure to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Avoiding misallocation of testing resources.* Any request by an inmate should appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders.

- *Addressing the need for food, housing, medical care, transportation, employment, and other necessities.* Any release order should evaluate whether a released inmate could find—during a pandemic—food, medical care, housing, safe (often interstate) transportation needed to relocate from prison to the inmate's home, and employment during a time when an extraordinarily large number of people are losing their jobs.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to

which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.*  To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

- *Making release decisions fast enough and accurately enough to make a difference.*  An inmate's release request requires a court to determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison.

- *Appropriately prioritizing supervision resources.*  The Probation Office's resources to supervise released inmates are necessarily limited, and any inmate's release should be assessed against the comparative advantages that another inmate might receive from those same supervisory resources.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court should also take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates.

This list is not exhaustive and, indeed, could include many additional considerations. The point is that the factors cited above illustrate a general truth—there are no known examples of effectively litigating out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the country and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly.  A more systematic remedy

than individual litigation in court is needed, and Congress provided a means for arriving at a more systematic response by amending § 3624(c)(2) while the pandemic is ongoing.

BOP has a massively important task ahead of it. Layering the burdens of a huge volume of emergency litigation on top of the difficult challenges that the pandemic has handed BOP is unhelpful. And it is likely to incentivize a counterproductive race to the courthouse in countless cases—a race that will necessarily require this Court to mete out limited re-entry and supervision resources on a first-come-first-serve basis that favors defendants who flout the administrative processes in place to prioritize release for the most vulnerable and least dangerous.

BOP has 132,908 federal inmates in BOP-managed institutions and 13,346 in community-based facilities. The BOP staff complement is approximately 36,000. As of June 19 2020, there are 1,266 federal inmates and 171 BOP staff who have confirmed positive test results for Covid-19 nationwide. Currently, 4,960 inmates and 503 staff have recovered. There have been 85 federal inmate deaths and 1 BOP staff member deaths attributed to Covid-19.

The defendant suggests FCI Jesup has a current, overwhelming number of patients and staff who have Covid-19. This is not the case. As of June 19, 2020, out of approximately 1,427 inmates, **there have been no inmates and no staff who actively have Covid-19 or have recovered from such at FCI Jesup**. *See* https://www.bop.gov/coronavirus.

The above points inform the legal framework discussed below.

I.    **The Defendant Cannot Establish Extraordinary and Compelling Reasons to Warrant a Reduction[3].**

Release is not appropriate because LLOYD cannot establish "extraordinary and compelling reasons to warrant such a reduction" under 3582(C)(1)(A)(i).

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress has created a narrow statutory framework in which defendants, the Bureau of Prisons, and the Sentencing Commission all play a relevant part.

To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id*.

---

[3] Defendant claims to have filed a request for release with BOP on April 20, 2020, which is before the 30-day requirement of 18 U.S.C. § 3582(c)(1)(A). ECF No. 395, Exhibit 4. Thus, the government will not address the exhaustion requirement in this response.

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." *Id.* § 1B1.13(1)(A).[4] Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Third, the court must conclude that "[t]he reduction is consistent with this policy statement." *Id.* § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling reasons:

    (A)    Medical Condition of the Defendant;

    (B)    Age of the Defendant;

    (C)    Family Circumstances; and

    (D)    Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1. Commentary to § 1B1.13, in turn, clarifies that the open-ended provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

Consistent with subdivision (D), the Bureau of Prisons has identified several nonexclusive factors for determining whether "other" extraordinary and compelling reasons exist. These include the defendant's criminal and personal history, the nature of his offense,

---

[4] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant is at least 70 years old and has served at least 30 years on his conviction. U.S.S.G. § 1B.13(1)(B).

12

disciplinary infractions, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense." BOP Program Statement 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The Program Statement explains that the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing." *Id.* at 1.

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

Defendant's motion emphasizes the generalized concern that he could become infected with COVID-19 at FCI Jesup. Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release. *See United States v. Cooper*, 2020 WL 2064066 (D. Nev. Apr. 29, 2020) (53-year-old with asthma and chronic sleep apnea presents no supporting records; further, BOP is making efforts to protect inmates, it is unclear that the defendant would be safer in the community, and the defendant states only generalized concerns). [I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).

Against the backdrop of BOP's efforts are the unique circumstances for this particular defendant, making compassionate release inappropriate because LLOYD does not qualify and poses a danger to the community. LLOYD has only served approximately 111 months of his 290 month prison sentence (or approximately 38% of his sentence). While he is 57 years-old, he was already given a reduction in sentence in terms of prison time, and now seeks to be released for an even greater reduction. This would greatly minimize the seriousness of his offense.

Further, LLOYD does not discuss or address his underlying conviction in his motion for release, nor discuss or address how he is no longer a risk to the community. In fact, the only danger LLOYD discusses is the potential danger to his health. To the contrary: LLOYD is a convicted leader in a drug conspiracy. He went to trial and never accepted responsibility. In fact, even in his pleading he still argues he was only a part of an over-arching conspiracy. ECF No. 395 at 5. While he has no criminal history prior to this conviction[5], this was a long-time conspiracy that involved a huge amount of drugs.

Based on medical records, attached under seal, it appears that LLOYD does have some serious health issues including diabetes, hypertension, and kidney disease. Exhibit A, Medical Records. However, the records do not mention "COPD" as defendant mentions in his motion. And, compassionate release on the basis of medical condition is limited, and none of the defendant's noted medical conditions are rare or extraordinary. *See United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (relief is "rare" and "extraordinary"). Courts have consistently denied compassionate release when medical circumstances are not sufficiently extraordinary. *See, e.g., United States v. Washington*, 2020 WL 1969301 (W.D.N.Y. Apr. 24,

---

[5] The government also notes he has no history of disciplinary infractions while in custody of BOP.

2020) (a "generalized claim of asthma, without more, is not a sufficiently extraordinary and compelling reason for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)"; in addition, the defendant has served only 18 months of a 121-month sentence for drug crimes)); *United States v. Lynn*, 2019 WL 3082202 (S.D. Ala. July 15, 2019), appeal dismissed, 2019 WL 6273393 (11th Cir. Oct. 8, 2019) (compassionate release, sought on the basis of a variety of health ailments, is denied, as none affect the inmate's ability to function in a correctional environment); *Cannon v. United States*, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (the 71-year-old defendant suffers from significant back and stomach issues, as well as high blood pressure, diabetes, skin irritation, loss of hearing, and various other complications, but relief is denied: "First, there is no indication that Cannon is terminally ill. Second, despite the many medical afflictions Cannon identifies, he does not state, much less provide evidence, that his conditions/impairments prevent him from providing self-care within his correctional facility. Rather, the medical records provided by Cannon show that his many conditions are being controlled with medication and there is no mention that his conditions are escalating or preventing him from being from being able to provide self-care."); *United States v. Bunnell*, 2019 WL 6114599 (D. Ariz. Nov. 18, 2019) (the defendant has "serious medical issues" – he "suffers from arthritis, sciatica, bulging lumbar discs 2-5, scoliosis, and degenerative disease causing central stenosis in his spine," and is confined to a wheelchair – but none of these are terminal illnesses or substantially diminish his ability to provide self-care within the environment of a correctional facility).

Furthermore, chronic conditions that can be managed in prison do not provide a sufficient basis for compassionate release. *United States v. Ayon-Nunez*, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020). The defendant's motion indicates that FCI Jesup is providing him with the medical care he requires, including prescriptions. The defendant further indicates he is awaiting

surgery for his hip. It appears that FCI Jesup is well-equipped to address the defendant's underlying medical concerns. *See United States v. Ramos*, 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (asthma is well-controlled).

The defendant has also fails to present a satisfactory release plan. If released, LLOYD plans on living with his nephew. LLOYD provides no further information. There is no information as to how he will refrain from reoffending. *Mitchell*, 2020 WL 2770070, at *4 ("Absent any evidence supporting defendant's rehabilitation or a detailed release plan imposing conditions to prevent the likelihood of defendant's reoffending from his home where he requests placement, defendant has not met his burden to show releasing him to home confinement will not pose a danger to the public"); *see also Meizin*, 2020 WL I 985042, at *5 ("effectively monitoring [petitioner] ... would enhance the risk of spread of COVID-19"). Similarly, the defendant's release plan is not reliable or indicative that appropriate conditions of supervision and would provide the community with adequate protection against the potential for a subsequent offense.

LLOYD also fails to provide specific evidence concerning how releasing the defendant to home confinement would minimize his risk of contracting coronavirus. And, as mentioned, there are no cases with Covid-19 at FCI Jesup. *See, e.g., United States v. Feiling*, at *8 ("More importantly, even if COVID-19 cases eventually emerge at FCI Loretto, Defendant fails to establish how his release on home confinement presents a viable alternative sentence. Indeed, Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety."). Further, LLOYD fails to show how release on home confinement presents a viable alternative sentence.

Finally, if this Court were to disagree with the United States' position above, any order that this Court issues that grants a defendant compassionate release should require defendant to

undergo a 14-day quarantine that BOP controls before any release as well as the assignment of the United States Probation Office to supervise his release.

## Conclusion

For the foregoing reason, the United States requests the Court deny the defendant's motion for compassionate release.

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: /s/ Elizabeth M. Yusi
Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address: elizabeth.yusi@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 19th day of June, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and will send a copy via U.S. Mail to the defendant.

                                  /s/ Elizabeth M. Yusi
                                  Elizabeth M. Yusi
                                  Assistant United States Attorney